[No. B098621. Second Dist., Div. Three. Aug. 7, 1997.]

DENNY'S, INC., Plaintiff and Appellant, v.
CITY OF AGOURA HILLS et al., Defendants and Appellants.

[And 10 other cases.]*

---

*Fence Factory v. City of Agoura Hills (No. LC026837), Roadside Lumber & Hardware, Inc. v. City of Agoura Hills (No. LC026838), Agoura Restaurants Inc. v. City of Agoura Hills (No. LC026839), Gabledon v. City of Agoura Hills (No. LC026842), Amin v. City of Agoura Hills (No. LC026843), Chevron U.S.A., Inc. v. City of Agoura Hills (No. LC026844), Cimms, Inc. v. City of Agoura Hills (No. LC026846), Union Oil Co. v. City of Agoura Hills (No. LC026858), Texaco Refining Marketing Inc. v. City of Agoura Hills (No. LC026864), Terry O. Herrick, Inc. v. City of Agoura Hills (No. BS028340).

1314

## COUNSEL

James G. Allen, Diane Pappas, Robert M. Aran, Barger & Wolen, Larry M. Golub, Barbosa, Garcia & Barnes, Douglas D. Barnes, Brown, Altshuler & Spiro, Ira Spiro, Pillsbury, Madison & Sutro, Walter R. Allan, William K. Dial and Marvin Bartel for Plaintiffs and Appellants.

Gregory W. Stepanicich, City Attorney, Richards, Watson & Gershon, Mitchell E. Abbott, Steven R. Orr and Daniel L. Pines for Defendants and Appellants.

Kronick, Moskovitz, Tiedemann & Girard, Michael F. Dean and Deborah M. Cooke as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

**KLEIN, P. J.**—Defendants and appellants the City of Agoura Hills, the City Council of the City of Agoura Hills, the Planning Commission of the City of Agoura Hills, the Board of Zoning Adjustments of the City of Agoura Hills, the Department of Planning and Community Development of the City of Agoura Hills, and the Director of Planning and Community Development of the City of Agoura Hills (collectively, the City) appeal a judgment in an action for declaratory and injunctive relief.[1]

Plaintiffs and appellants Denny's, Inc. (Denny's), Texaco Refining and Marketing Inc. (Texaco), Cimm's Inc., doing business as Burger King (Burger King), Agoura Restaurants Incorporated, doing business as McDonald's (McDonald's), Fence Factory, Inc., a California corporation (Fence Factory), Roadside Lumber & Hardware, Inc., a California corporation (Roadside Lumber), Jeff Amin (Amin) (a Mobil Oil franchisee), Albert P. Gabledon (Gabledon), Chevron U.S.A., Inc. (Chevron), and Union Oil Company of California, doing business as Unocal (Unocal), (collectively, plaintiffs) filed protective cross-appeals.[2]

The essential issue presented is whether plaintiffs' preexisting business signs are protected by Business and Professions Code section 5499 from the City's signage ordinance (the ordinance).[3]

The trial court correctly held section 5499 is implicated because the ordinance prohibits pole signs based on their height or size, rather than

---

[1] An amicus curiae brief in support of the City's position was filed by 101 California cities.

[2] In addition to the plaintiffs mentioned above, there is another plaintiff, Terry O. Herrick, Inc., a California corporation, doing business as Jack in the Box (Herrick). Unlike the other plaintiffs, Herrick has not cross-appealed and is solely a respondent. However, Herrick has not filed a respondent brief.

[3] Business and Professions Code section 5499 states: "Regardless of any other provision of this chapter or other law, no city or county shall require the removal of any on-premises advertising display on the basis of its height or size by requiring conformance with any ordinance or regulation introduced or adopted on or after March 12, 1983, if special topographic circumstances would result in a material impairment of visibility of the display or the owner's or user's ability to adequately and effectively continue to communicate with the public through the use of the display. Under these circumstances, the owner or user may maintain the advertising display at the business premises and at a location necessary for

categorically prohibiting all pole signs. Further, the trial court properly found that due to the presence of special topographic circumstances, signs conforming to the ordinance would be materially less visible and less effective than the existing signs, and that plaintiffs therefore are entitled to retain their current signs. The judgment is affirmed.

### Factual and Procedural Background

The City was incorporated in 1982. In 1985, the city council adopted Ordinance No. 75, which regulated signage within the City. The ordinance later was codified as Agoura Hills Municipal Code (AHMC) section 9655 et seq.

Pursuant to the ordinance, with certain exceptions, all freestanding or pole signs became nonconforming upon adoption of the ordinance, and subject to removal on March 19, 1992, upon expiration of a seven-year amortization period specified in the ordinance.

The plaintiff businesses include fast-food restaurants and gasoline service stations. The business establishments and their signs all predate the enactment of the ordinance. The signs in issue are freestanding or pole signs bearing the names or logos of plaintiffs' businesses. Many of the signs are highly visible from the Ventura Freeway due to their height and size. Plaintiffs filed applications for variances with the City's planning commission. The applications were denied, as were the subsequent appeals to the city council. The city council determined the pole sign owners had failed to demonstrate any "special circumstances" to warrant the grant of any variances, and if the applicants were allowed to retain their pole signs, it would be inequitable to new and existing businesses which are not allowed to erect or maintain pole signs.

Plaintiffs then filed their actions in the superior court seeking injunctive, declaratory and/or mandamus relief pursuant to section 5499 to prevent enforcement of the ordinance requiring removal of the pole signs.[4] The actions were consolidated.

The matter was bifurcated. The threshold issue tried was whether the City's ordinance is preempted by section 5499. With the parties' consent, the

---

continued public visibility at the height or size at which the display was previously erected and, in doing so, the owner or user is in conformance."

All unspecified statutory references are to the Business and Professions Code.

[4]Article XI of the California Constitution provides that every city possesses the general power to " 'make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.' (Cal. Const., art. XI, § 7.)" (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 704 [209 Cal.Rptr. 682, 693 P.2d 261]; accord, *Cawdrey* v. *City of Redondo Beach* (1993) 15 Cal.App.4th 1212, 1218 [19 Cal.Rptr.2d 179].)

matter was submitted on declarations and exhibits, without live testimony. The trial court also traveled the freeway corridor in both directions to view the existing signage, the terrain, and the potential impact on the visibility of plaintiffs' businesses if the pole signs were eliminated and replaced by conforming signage.

1. *Trial court's ruling.*

In an extensive statement of decision, the trial court ruled, inter alia:

The ordinance is within, and forbidden by, section 5499 because the statute prohibits local proscription of signs based on height, and that is precisely what the ordinance does. Although the City contended the ordinance categorically forbids all pole signs, not just pole signs exceeding a certain height, the ordinance was height based, in that short pole signs are not wholly forbidden. "The ordinance plainly discriminates between tall signs and short signs."

With respect to whether special topographic circumstances existed to preclude enforcement of the height-based ordinance, the trial court concluded the term "topography" connotes not only natural surface contours but rather, "all nontemporary surface conditions of whatever origin." Further, "the term 'special topographic circumstances' is not to be taken as an isolated term, but rather to be read in the context of the whole statutory passage, and the subject matter that the Legislature had in view. Thus read in context, it seems plain that by the text 'special topographic circumstances . . . result[ing] in a material impairment of visibility of the display . . . ,' the Legislature meant any material visual impediment other than the natural limits of human eyesight, based on the unique specifics of the particular site, sign, and visual obstructions. . . . [¶] Thus, *all* 'circumstances' must be taken into account, including not only nature's hills and trees, but also variant height terrain and vision interruptions from any other source, the height and size of the acclivity and concrete structure of the Kanan Road overpass, the building structures in the area, utility poles and wires, vehicles traveling the freeway, etc. [¶] The evidence clearly establishes that these special topographic circumstances would materially impair the visibility of conforming signs for each plaintiff." Therefore, plaintiffs were "entitled to prevail, first of all, based on the material impairment of raw visibility, . . ."

As an alternative and additional basis for its decision, the trial court observed section 5499 has a disjunctive component to be analyzed, namely, whether "special topographic circumstances would result in a material impairment of . . . the owner's or user's ability to adequately and effectively

continue to communicate with the public through the use of the display." (§ 5499.) From the disjunctive second element, "it seems plain that the Legislature was concerned with something more than the 'raw' or 'naked' visibility of the sign, . . . It is evident that the Legislature was also concerned with the communicative quality of the sign, on top of the sign's raw visibility. [¶] . . . [¶] . . . [T]his second statutory element requires at a minimum a circumstantial analysis of not only the simple visibility of the sign, but also whether the sign will be *noticed*, and the message imparted to the viewer's brain. . . . [¶] The additional circumstances bearing on noticeability, or perceptibility, would include the origin and nature of the customer base and buying motivation, general visibility in the area, the high speed, high volume nature of the freeway, location of decision points for motorists along the freeway, identification time and reaction time, and time to make safe lane changes. . . . [¶] . . . [T]he evidence clearly establishes that these special topographic circumstances would materially impair the noticeability, or perceptibility, of conforming signs for each plaintiff."

The trial court went on to find as to each of the plaintiffs, there would be "a material impairment in the commercial effectiveness of a conforming sign." Each of the businesses "relies on its existing sign to attract customers . . . substantially . . . from the freeway . . . ." The trial court reviewed the individual circumstances of the various businesses involved, and found, inter alia, a conforming sign would not be visible at all from the freeway, or that a conforming sign would not be visible to freeway motorists in time to exit safely at the off-ramp.

Based thereon, the trial court declared the attempted enforcement of the sign ordinance against these plaintiffs was in contravention of section 5499 and invalid, and that plaintiffs were entitled to maintain the disputed signage at their premises. The trial court also enjoined the City from enforcing the ordinance against the signs at issue herein.

The City appealed the judgment. The plaintiffs filed protective cross-appeals.

## CONTENTIONS

The City contends the judgment should be reversed for three primary reasons: the ordinance does not regulate signs "on the basis of height or size," and therefore is not within the prohibitory scope of section 5499; even if the ordinance regulates advertising displays on the basis of height or size, plaintiffs failed to demonstrate the existence of "special topographic circumstances" which would permit them to take advantage of section 5499, and

failed to demonstrate that by reason of such "special topographic circumstances," prohibiting the use of pole signs would materially impair the visibility of their businesses; and the trial court deprived the City of a fair trial when it quashed the City's trial subpoenas, which sought evidence from third party witnesses as to the equal effectiveness of signage other than freestanding pole signs.

DISCUSSION

1. *The statute.*

  a. *Historical overview.*

Section 5499 originally was enacted in 1983 as part of Senate Bill No. 142, which added section 5490 et seq. to the Business and Professions Code. (Stats. 1983, ch. 1232, § 1, pp. 4801-4805; 4 Stats. 1983 (Reg. Sess.) Summary Dig., ch. 1232, p. 453.)

At that time, existing law provided generally that governmental entities were prohibited from compelling the removal of any lawfully erected outdoor advertising display unless just compensation were paid to the owner. The prohibition did not apply to certain on-premises displays. The new legislation enacted provisions to prohibit any city or county from requiring the removal of *on-premises* advertising displays without payment of fair and just compensation. (4 Stats. 1983 (Reg. Sess.) Summary Dig., ch. 1232, pp. 453-454.)

Section 5499, as adopted, stated: "No city or county shall require the removal of any on-premise advertising display *on the basis of its height* if special topographic circumstances would result in a material impairment of visibility of the sign or the owner's ability to adequately and effectively continue to communicate with the public through the use of the on-premise advertising display by conformance with any ordinance or regulation of any city or county, introduced or adopted after March 12, 1983. Under these circumstances, the owner or user may maintain advertising displays at the business premise and at a location necessary to accomplish continued noticeability at the height the display was previously erected and in doing so, the owner or user is in conformance." (Stats. 1983, ch. 1232, § 1, p. 4805, italics added.)

Section 5490 et seq. was a response to the efforts of local jurisdictions to regulate outdoor signage in accordance with changing aesthetic views. It would appear section 5499 was included as a grandfather provision to

exempt from local signage ordinances those businesses which were unable, due to special topographic circumstances, to utilize alternative advertising displays to achieve continued public visibility.

In 1986, the Legislature enacted Senate Bill No. 286 to clarify Senate Bill No. 142 in certain respects not relevant here. Section 5499 was repealed and reenacted in substantially the same form. (Stats. 1986, ch. 513, §§ 7, 8, p. 1849.) The new version of section 5499, which remains on the books, provides: "Regardless of any other provision of this chapter or other law, no city or county shall require the removal of any on-premises advertising display on the basis of its *height or size* by requiring conformance with any ordinance or regulation introduced or adopted on or after March 12, 1983, if special topographic circumstances would result in a material impairment of visibility of the display or the owner's or user's ability to adequately and effectively continue to communicate with the public through the use of the display. Under these circumstances, the owner or user may maintain the advertising display at the business premises and at a location necessary for continued public visibility at the height or size at which the display was previously erected and, in doing so, the owner or user is in conformance." (Italics added.)

Thus, the statute essentially contains a two-part test. First, does the local ordinance require removal of a sign based on its height or size? If so, would special topographic circumstances cause a conforming sign to be materially less visible or less effective at communicating the owner's message to the public?[5]

b. *Principles of statutory interpretation.*

In approaching the issue, we are mindful "[t]he fundamental task of statutory construction is to 'ascertain the intent of the lawmakers so as to

---

[5]It appears the trial court mischaracterized the issue as one of preemption. State preemption of the municipal exercise of police powers pursuant to California Constitution, article XI, section 7, may be inferred if " ' "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; [or] (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality." ' [Citations.]" (*Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 708.)

Here, the issue is not whether section 5499 occupies the field so as to preclude local action, but rather, whether special topographic circumstances entitle plaintiffs' preexisting signs to protection under section 5499 from the City's ordinance. Nonetheless, the trial court's misnomer was harmless and did not impact the trial court's thoughtful and well-reasoned analysis of the statute and its application to this fact situation.

effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute.' [Citation.] The words of a statute are to be interpreted in the sense in which they would have been understood at the time of the enactment. [Citations.]" (*People* v. *Cruz* (1996) 13 Cal.4th 764, 774-775 [55 Cal.Rptr.2d 117, 919 P.2d 731]; accord, *Resure, Inc.* v. *Superior Court* (1996) 42 Cal.App.4th 156, 164 [49 Cal.Rptr.2d 354].)

2. *The City's ordinance.*

The City enacted an extensive sign ordinance "with particular regard to developing a city that is visually attractive and to preserving and enhancing the visual qualities of the community's streets and highways." (AHMC, § 9655.) To eliminate visual blight, the ordinance prohibits various types of signs. (AHMC, § 9655.3.)

AHMC section 9655.3, which sets forth the types of signs that are banned, prohibits, inter alia, *"Except as hereinafter provided, freestanding or pole signs, except for on-site directional signs."* (AHMC, § 9655.3(L) italics added.)[6]

The ordinance defines a *"freestanding pole sign"* as "a sign supported by uprights or braces placed upon or into the ground and detached from any building." (AHMC, § 9655.2(L).)

The issue presented is whether the ordinance bars pole signs based on their height or size, so as to implicate section 5499. The City argues the statute is inapplicable because its ordinance categorically prohibits *all* pole signs. Plaintiffs contend, and the trial court agreed, the statute does apply because the ordinance regulates pole signs on the basis of height or size by exempting various shorter pole signs from the ordinance's general prohibition on pole signs.

---

[6]AHMC section 9655.3 provides in relevant part: "Except for those signs allowed under the provisions of section 9655.4F, 'Special permits,' the following signs are prohibited: [¶] A. Outdoor advertising displays, structures or signs. [¶] B. Portable signs. [¶] C. Exposed neon, flashing or scintillating signs, . . . [¶] D. Revolving signs. [¶] E. Devices dispensing bubbles and freefloating particles of matter. [¶] F. Any notice, placard, bill, . . . or other device affixed or attached to or upon any public street, walkway, crosswalk, other rights-of-way, curb, lamppost, hydrant, tree, telephone booth or pole, . . . [¶] G. Devices projecting or otherwise producing the image of an advertising sign or message on any surface or object. [¶] H. Projecting signs. [¶] I. Signs which project or encroach into any existing or future street right-of-way. [¶] J. Automatic changing signs or electronic message center signs, except for public service time and temperature signs. [¶] K. Streamers, banners, balloons, flares, flags, pennants, propellers, twirlers, . . . : [¶] . . . [¶] L. *Except as hereinafter provided, freestanding or pole signs, except for on-site directional signs.* [¶] M. A vehicle related portable freestanding sign . . . . [¶] . . . [¶] Q. Signs painted directly on an exterior wall, fence, fascia or parapet. [¶] . . . [¶] T. Roof signs." (Italics added).

### a. *Trial court properly found section 5499 is implicated because the ordinance prohibits the subject pole signs based on their height and size.*

As indicated, the trial court found the ordinance regulates plaintiffs' signs based on their height and size, and therefore the ordinance is within the ambit of the statute. Our scrutiny of the ordinance lead us to concur in the trial court's conclusion.

The ordinance does not prohibit all pole signs. AHMC section 9655.3(L), while prohibiting freestanding or pole signs generally, expressly permits "on-site directional signs" as well as freestanding or pole signs "as hereinafter provided."

Pole signs "hereinafter provided" in the AHMC include: signs expressing a political, social, religious or other noncommercial message, not exceeding eighteen square feet in area and, if located on a stake, not exceeding six feet in height (AHMC, § 9655.4(D)(6)); residential nameplates, not exceeding two square feet in area and, when attached to a stake, not more than four feet in height (AHMC, § 9655.6(A)(1)); agricultural signs, not exceeding six square feet in area and, when attached to a stake, not more than six feet in height (AHMC, § 9655.6(A)(2)); residential real estate advertising signs, or garage sale signs, not exceeding six square feet in area and six feet in height (AHMC, § 9655.6(A)(3) and (6)); real estate open house signs, not exceeding three square feet in area and, if located on a stake, not exceeding four feet in height (AHMC, § 9655.6(A)(4)); gasoline price signs, not exceeding twenty square feet in area and six feet in height (AHMC, § 9655.6(C)(15)(a));[7] and commercial real estate advertising signs, not exceeding fifteen square feet in area and six feet in height (AHMC, § 9655.6(C)(18)(c)).

Thus, it is readily apparent the ordinance does not categorically prohibit freestanding or pole signs. Numerous types of *shorter* freestanding or pole signs, including commercial signs, are permitted. Therefore, it follows the ordinance bars plaintiffs' signs based on their height and size.

### b. *The City's arguments are without merit.*

The City's basic argument is that the ordinance does not require removal of the subject signs based on their height or size. Rather, according to the

---

[7]The City asserts the reason gasoline price pole signs are permitted under the ordinance is that section 13531 mandates the display of fuel prices. However, said statute merely requires the posting of such prices so that they are "clearly visible from the street or highway adjacent to the premises." (§ 13531, subd. (a).) The statute does not require the advertising medium to be a pole sign, as opposed to a monument sign or other type of sign.

City, the ordinance prohibits pole signs as a class or type. Plaintiffs, in turn, contend the City's claim it has categorically prohibited all pole signs is a sham in that the City allows short pole signs but prohibits taller pole signs.

In response, the City argues the short pole signs which are permitted under the AHMC are really not pole signs at all. The City cites, inter alia, the following definition of "pole sign" in a declaration by one of plaintiffs' experts: "As a matter of common understanding, both in the sign industry and among the regulatory agencies, 'pole signs' are signs of considerable size and height, at least 6 feet of grade clearance beneath the sign. The term is not generally used to refer to small real estate signs or similar small signs, even when they are mounted on a stake and physically resemble small versions of pole signs. Although the concepts are vague, as a rule of thumb, generally the term 'pole sign' is reserved for a sign mounted on a pole or other support that one can walk under." Therefore, according to the City, "real estate 'for sale' signs, political placards . . . and Westec security signs are simply not 'pole signs.' "

The City's contention pole signs are inherently tall, and that the ordinance contains a blanket prohibition on pole signs, is unpersuasive. The ordinance defines "*freestanding pole sign*" to refer to signs "supported by uprights or braces placed upon or into the ground and detached from any building." (AHMC, § 9655.2(L).) Thus, the ordinance defines "freestanding pole sign" without regard to height.

Further, the ordinance provides pole signs, "[e]xcept as hereinafter provided," are prohibited. (AHMC, § 9655.3(L).) As explained above, the pole signs "hereinafter provided" for by the ordinance are various shorter pole signs. Therefore, the City's own ordinance regards these smaller pole signs as permissible pole signs. If, as the City argues, it has categorically banned all pole signs and small pole signs are really not pole signs, the "[e]xcept as hereinafter" language in AHMC section 9655.3(L) would be rendered surplusage. Such an interpretation is to be avoided. (*Brown* v. *Superior Court* (1984) 37 Cal.3d 477, 484 [208 Cal.Rptr. 724, 691 P.2d 272].)[8]

The City also argues the trial court ignored evidence the ordinance does not in fact regulate based on height. The City asserts the trial court failed to consider there are many legal, conforming signs in the City which are taller and larger in surface area than the subject pole signs which the City seeks to remove. For example, the Radisson Hotel's wall sign is 57 feet above ground and is legal, even though it is higher than many of plaintiffs' pole signs.

---

[8]At oral argument, counsel for the City reiterated the position the ordinance bans *all* pole signs, and asserted the "[e]xcept as hereinafter provided" language in AHMC section 9655.3(L) is surplusage. The argument is contrary to the canons of statutory construction.

The contention likewise is unpersuasive. The fact the City permits *wall* signs on buildings does not alter the fact the City permits short pole signs and prohibits those pole signs which are large or tall.

In sum, contrary to the City's argument, the ordinance does not ban "pole signs" as a class. Rather, the ordinance bans those pole signs which are large or tall. Because the ordinance regulates pole signs on the basis of height and size, the trial court properly found section 5499 is implicated.

### 3. *Trial court properly found special topographic circumstances entitle plaintiffs to retain their signs.*

As noted, section 5499 mandates a two-part analysis of local sign restrictions. The first question is whether the restriction requires removal of a sign based on its height or size. Once it is determined the restriction is height or size based, the inquiry is whether the terrain would impair the function of a conforming sign. Having concurred with the trial court that the ordinance requires removal of plaintiffs' signs based on their height and size, the remaining issue is whether special topographic circumstances are present so as to bring plaintiffs within the protection of section 5499.

#### a. *Topography is not limited to natural contours.*

■ The trial court construed "topographic circumstances" within section 5499 as "all nontemporary surface conditions of whatever origin." The City contends the trial court's interpretation was overbroad. The City argues topographic circumstances refer solely to *naturally occurring* topographic surface contours.

The trial court properly rejected the City's narrow definition. "Topography" is defined in the dictionary as "the configuration of a surface including its relief and the position of its natural *and man-made* features . . . ." (Webster's New Internat. Dict. (3d ed. 1986) p. 2411, italics added.)

■ Even assuming the City's definition were tenable, "[w]here a statute is theoretically capable of more than one construction we choose that which most comports with the intent of the Legislature. [Citations.]" (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].) ■ Clearly, the Legislature intended to protect business owners where the topography is such that a conforming sign would be inadequate to communicate with the public. Therefore, the trial court properly held the term "topographic circumstances" embraces man-made features as well as the land's natural contours.

Having said that, it appears the trial court's interpretation was somewhat overbroad. The trial court ruled "topographic circumstances" includes "not only nature's hills and trees, but also variant height terrain and vision interruptions from any other source, the height and size of the acclivity and concrete structure of the Kanan Road overpass, the building structures in the area, utility poles and wires, *vehicles traveling the freeway*, etc." (Italics added.) It would appear traffic is not a topographic circumstance, in that topography connotes the fixed surface features of the land. However, the error was harmless because, as discussed below, the record amply supports the trial court's finding special topographic circumstances are present.

b. *Special topographic circumstances do not mean unique or exceptional circumstances.*

The trial court concluded that by the term "special topographic circumstances . . . result[ing] in a material impairment of visibility of the display" (§ 5499), the Legislature meant "any material visual impediment other than the natural limits of human eyesight, based on the unique specifics of the particular site, sign, and visual obstructions."

Here again, the City criticizes the trial court's interpretation as overbroad. The City emphasizes the Legislature used the term "special topographic circumstances," not "*any* topographic circumstances" or "*any material visual impediment.*" According to the City, "special topographic circumstances" must be read as requiring unique or exceptional circumstances.

We are mindful the word "special" has numerous meanings. One definition is "distinguished by some unusual quality: uncommon, noteworthy, extraordinary." (Webster's New Internat. Dict., *supra*, p. 2186.) However, "special" also is synonymous with "particular" or "individual." (*Ibid.*)

Again, we observe that courts " 'must give statutes a reasonable construction which conforms to the apparent purpose and intention of the lawmakers.' [Citation.]" (*Webster v. Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596].) The Legislature's apparent purpose in enacting section 5499 was to protect the owner or user of an existing sign from a new signage ordinance in a situation where the topographic circumstances would make a conforming sign either materially less visible *or* less effective. Therefore, it is reasonable to interpret the statute's requirement of "special" topographic circumstances simply to mean *particular* or *individual* topographic circumstances which would make a conforming sign inadequate.

To construe section 5499 as requiring an owner to make the lofty showing being urged by the City would be to defeat the purpose of the statute. As the

trial court observed, in a state as large and geographically diverse as California, hardly any topography is unique or extraordinary. If that were what is required, few sign owners could avail themselves of the protection of the statute. Given the Legislature's purpose in enacting section 5499, the City's interpretation is not persuasive.

    c. *Special topographic circumstances relate to both the visibility and the commercial effectiveness of a conforming sign.*

Section 5499 protects the owner or user of an existing sign "if special topographic circumstances would result in a material impairment of visibility of the display *or* the owner's or user's ability to adequately and effectively continue to communicate with the public through the use of the display." (Italics added.) These elements are in the disjunctive.

Consequently, the trial court found the Legislature was concerned not only with what the trial court described as the "raw visibility" of a conforming sign, but also, with whether such a sign would be commercially effective. Therefore, in addition to the sign's "simple visibility," the trial court examined "whether the sign will be *noticed,* and the message imparted to the viewer's brain. . . . [¶] The additional circumstances bearing on noticeability, or perceptibility, would include the origin and nature of the customer base and buying motivation, general visibility in the area, the high speed, high volume nature of the freeway, location of decision points for motorists along the freeway, identification time and reaction time, and time to make safe lane changes."

Given the language of the statute, the trial court's examination of these various factors was appropriate.

    d. *Substantial evidence supports trial court's finding of special topographic circumstances.*

Having determined the trial court's legal interpretation of section 5499 was sound, the remaining issue is whether there is substantial evidence to support the trial court's factual findings concerning special topographic circumstances. In that regard, the trial court made alternative findings. It found the individual topographic circumstances "would materially impair the visibility of conforming signs for each plaintiff." In addition, the trial court found said circumstances would materially impair the owner's ability to communicate adequately and effectively with the public.

As indicated, the trial court personally toured the freeway corridor in both directions to view the existing signage, the terrain, and the potential impact

on the visibility of respondents' businesses if the pole signs were eliminated and replaced by conforming signage. Therefore, the trial court was in the best position to determine whether the particular topographic circumstances would make a conforming sign materially less visible or less effective.

■ It is settled "that a view of the scene by the trial judge is independent evidence on which a finding may be made and sustained (*Otey* v. *Carmel Sanitary Dist.* [(1933)] 219 Cal. 310, 312 [26 P.2d 308]; Evid. Code, § 140)." (*Hutcherson* v. *Alexander* (1968) 264 Cal.App.2d 126, 131 [70 Cal.Rptr. 366]; accord, *Gates* v. *McKinnon* (1941) 18 Cal.2d 179, 182-183 [114 P.2d 576]; *Rowland* v. *City of Pomona* (1947) 82 Cal.App.2d 622, 624-625 [186 P.2d 447]; see generally, 2 Witkin, Cal. Evidence (3d ed. 1986) Demonstrative, Experimental and Scientific Evidence, § 851, pp. 816-817.)

■ The record on appeal provides further support for the trial court's factual findings. The trial exhibits include photographs of plaintiffs' existing signs viewed from the perspective of a motorist on the freeway. In a second set of photographs, each of the nonconforming signs was digitally removed and the image revised by digitally inserting a hypothetical sign conforming to the ordinance. Given the drastic difference in these images between the existing and hypothetical signs in terms of visibility and visual impact, there is substantial evidence to support the trial court's determination that conforming signs would be materially less visible or less effective at conveying the owner's messages to the public.

### 4. *No prejudicial error in quashing of the City's subpoenas.*

■ On an ex parte application by Texaco, the trial court quashed numerous trial subpoenas for business records which the City had served on custodians of similar businesses in nearby communities which do not allow pole signs. The City asserts it was denied a fair trial because the gross sales information sought by the subpoenas would have borne directly on the test set forth in section 5499, namely, whether requiring removal of the pole signs would materially impair the businesses' "ability to adequately and effectively continue to communicate with the public."

The record reflects the trial court quashed the subpoenas under Evidence Code section 352 because it reasoned "[j]ust how commercially effective signs may be at other locations is not directly relevant here. [The City] claim[s] that many businesses with conforming signs, both within Agoura Hills and elsewhere, enjoy vigorous business and healthy sales. Such [may] well be generally true. But that is not the statutory test."

The statute supports the trial court's ruling. The relevant inquiry under section 5499 is whether "special topographic circumstances would result in a

material impairment of . . . the owner's or user's ability to adequately and effectively continue to communicate with the public through the use of the display." (§ 5499.) Thus, the issue is whether the particular topography would impair the efficacy of a conforming sign. The fact a similar business in an adjacent city is profitable despite the lack of a pole sign has no bearing on that question.

Further, and in any event, the City clearly was not prejudiced by the quashing of the subpoenas. Section 5499 protects existing signage if special topographic circumstances "would result in a material impairment of visibility of the display *or* the owner's or user's ability to adequately and effectively continue to communicate with the public through the use of the display." (§ 5499, italics added.) In the statement of decision, the trial court ruled "the plaintiffs are entitled to prevail, first of all, based on the material impairment of raw visibility, . . . Anything more here is an alternative finding." Therefore, the subpoenas, which pertained only to the issue of the commercial effectiveness of conforming signage, would not have led to an outcome more favorable to the City.[9, 10]

### 5.   *Unnecessary to address cross-appeals.*

On cross-appeal, the plaintiffs contend that in the event of a reversal and retrial, the trial court's case management order, with its restrictions on discovery and live testimony, should be vacated. Plaintiffs also contend that if the judgment is reversed, their remaining claims against the City, which the trial court dismissed as moot following resolution of the section 5499 issue, should be reinstated.

Because the judgment is being affirmed on appeal, no ruling on the cross-appeals is necessary.

---

[9]No published case has construed section 5499. If our interpretation of various aspects of the enactment in affirming the reasoning of the trial court is not what the Legislature intended, the statute should be clarified. (See *Malibu Committee for Incorporation* v. *Board of Supervisors* (1990) 222 Cal.App.3d 397, 410 [271 Cal.Rptr. 505]; *Mir* v. *Charter Suburban Hospital* (1994) 27 Cal.App.4th 1471, 1487, fn. 7 [33 Cal.Rptr.2d 243]; *Las Tunas Beach Geologic Hazard Abatement Dist.* v. *Superior Court* (1995) 38 Cal.App.4th 1002, 1016, fn. 10 [45 Cal.Rptr.2d 529]; *United Farm Workers of America* v. *Agricultural Labor Relations Bd.* (1995) 41 Cal.App.4th 303, 321 [48 Cal.Rptr.2d 696].)

[10]The City seeks our guidance to assist it in drafting a sign ordinance which would achieve the elimination of the subject pole signs. "The rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court. [Citations.]" (*People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910, 912 [83 Cal.Rptr. 670, 464 P.2d 126]; accord, *Butt* v. *State of California* (1992) 4 Cal.4th 668, 705 [15 Cal.Rptr.2d 480, 842 P.2d 1240] (dis. opn. of Lucas, C. J.); *Hill* v. *Hill* (1947) 79 Cal.App.2d 368, 370 [180 P.2d 378].) We therefore deny the City's request.

## DISPOSITION

The judgment is affirmed. Plaintiffs to recover costs on appeal.

Kitching, J., and Aldrich, J., concurred.