[No. S091421. Mar. 4, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
CONRAD RICHARD McKAY, Defendant and Appellant.

**COUNSEL**

Richard L. Fitzer, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Marc E. Turchin, Acting Assistant Attorney General, Carol Wendelin Pollack and Pamela C. Hamanaka, Assistant

Attorneys General, Jaime L. Fuster, Steven D. Matthews and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—California has, in various statutes, limited the circumstances in which a peace officer may effect a custodial arrest for minor offenses. (E.g., Pen. Code, §§ 818, 827.1, 853.5, 853.6; Pub. Resources Code, § 5786.17; Veh. Code, §§ 40302, 40302.5, 40303, 40303.5, 40304, 40305, 40305.5.) California also has, by the passage of Proposition 8 in 1982, limited the circumstances in which a trial court may exclude relevant evidence as a sanction for the violation of these state statutes. (Cal. Const., art. I, § 28, subd. (d).) ▮ As we have previously observed, state statutes limiting police discretion are not inconsistent with the state constitutional provision limiting the exclusion of evidence as a sanction for their violation. The "substantive scope" of state statutes governing the ability of peace officers to effect a custodial arrest for minor offenses "remains unaffected by Proposition 8." (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744].) "What Proposition 8 does is to eliminate a judicially created *remedy* for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled." (*Id.* at pp. 886-887.)

In this case, the only remedy defendant Conrad Richard McKay seeks is the exclusion of a baggie of methamphetamine that was found in his sock during a search incident to his arrest for the infraction of riding his bicycle in the wrong direction on a residential street. Defendant argues that a custodial arrest for a fine-only offense, such as a traffic infraction, violates the Fourth Amendment prohibition on unreasonable seizures. He also argues, in the event the Fourth Amendment does not bar such arrests categorically, that his custodial arrest nonetheless violated the federal Constitution by the deputy's failure to comply with Vehicle Code section 40302, subdivision (a) (section 40302(a)), the state statute that governs the arrest procedure for this infraction.

We conclude, in accordance with United States Supreme Court precedent, that custodial arrests for fine-only offenses do not violate the Fourth Amendment and that compliance with state arrest procedures is not a component of the federal constitutional inquiry. We also conclude, in the alternative, that the arrest here complied with section 40302(a). Accordingly, we affirm the judgment of the Court of Appeal.

# I

## BACKGROUND

Around 6:00 p.m. on June 19, 1999, Los Angeles County Deputy Sheriff Valento observed defendant riding a bicycle in the wrong direction on a residential street. Deputy Valento initiated a traffic stop, intending to issue defendant a citation for violating Vehicle Code section 21650.1.[1] The deputy asked defendant for identification. Defendant said he did not have any identification with him and instead told the deputy his name and date of birth. Deputy Valento took defendant into custody, pursuant to section 40302(a), based on his failure "to present his driver's license or other satisfactory evidence of his identity for examination." During a search incident to that arrest, Deputy Valento found, in defendant's left sock, a baggie containing an off-white substance he believed to be methamphetamine.

After placing defendant in the back of the patrol car, Deputy Valento entered the name and date of birth defendant had provided into the patrol car's computer and received an address that matched the address defendant had given him and a general description that was consistent with defendant's appearance.

Defendant was charged with possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)) and alleged to have suffered a prior strike conviction. He moved to suppress the evidence, pointing out that he had given his name and date of birth to Deputy Valento, who was subsequently able to "check it out through the computer." After the trial court denied the motion to suppress, relying on *People v. Monroe* (1993) 12 Cal.App.4th 1174 [16 Cal.Rptr.2d 267] (*Monroe*), defendant pleaded guilty, admitted the prior, and was sentenced to the doubled term of 32 months. A divided panel of the Court of Appeal, once again relying on *Monroe*, affirmed his conviction.

# II

Defendant was arrested for violating section 21650.1, which requires a bicycle to be operated "in the same direction as vehicles are required to be driven upon the roadway." This infraction is punishable by a fine not to exceed $100. (§§ 40000.1, 42001, subd. (a)(1).) There is no dispute that Deputy Valento was justified in stopping defendant based on this violation. Rather, defendant argues that a custodial arrest for such a minor offense violated the Fourth Amendment. If such arrests are valid, he then argues that

---

[1]Unless otherwise indicated, all further statutory references are to the Vehicle Code.

once he provided his name and date of birth, the deputy lacked authority to effect a custodial arrest under section 40302(a) and that this asserted violation of state law thereby violated the federal Constitution.

## A

Appellant's first contention, he now concedes, is foreclosed by *Atwater v. Lago Vista* (2001) 532 U.S. 318 [121 S.Ct. 1536, 149 L.Ed.2d 549] (*Atwater*), which upheld a custodial arrest for a violation of Texas's seatbelt law, an offense punishable by a fine of not less than $25 nor more than $50. (*Id.* at p. 323 [121 S.Ct. at p. 1541].) ■ Under *Atwater*, all that is needed to justify a custodial arrest is a showing of probable cause. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." (*Id.* at p. 354 [121 S.Ct. at p. 1557].) We must therefore conclude that there is nothing inherently unconstitutional about effecting a custodial arrest for a fine-only offense. (*U.S. v. McFadden* (2d Cir. 2001) 238 F.3d 198, 204 [upholding search incident to arrest for riding a bicycle on the sidewalk].)

## B

Although *Atwater* permits the police to effect custodial arrests for even the most minor of offenses, many states—including California—have sought to limit this broad discretion by statute, local ordinance, or departmental regulation. Defendant relies in particular on section 40302(a), which requires the officer to effect a custodial arrest for nonfelony Vehicle Code offenses when the offender fails to present a driver's license "or other satisfactory evidence of . . . identity for examination." Defendant claims that his oral statements to the deputy constituted "satisfactory evidence of . . . identity" under section 40302(a), rendering his arrest unauthorized under California law. The Attorney General, on the other hand, contends that the deputy complied with California law in that section 40302(a) requires an officer to accept only a driver's license or its functional equivalent.

### 1

Before we resolve the dispute over the construction of section 40302(a), though, we must first determine whether compliance with state arrest procedures affects the validity of an arrest under the federal Constitution. Neither the majority nor the dissent below considered this threshold issue, nor did the majority and dissent in *Monroe*. The issue, however, cannot be ignored.

With the passage of Proposition 8, we are not free to exclude evidence merely because it was obtained in violation of some state statute or state constitutional provision. ■ " 'Our state Constitution . . . forbids the courts to order the exclusion of evidence at trial as a remedy for an unreasonable search and seizure unless that remedy is required by the federal Constitution as interpreted by the United States Supreme Court.' " (*People v. Camacho* (2000) 23 Cal.4th 824, 830 [98 Cal.Rptr.2d 232, 3 P.3d 878], quoting *In re Tyrell J.* (1994) 8 Cal.4th 68, 76 [32 Cal.Rptr.2d 33, 876 P.2d 519].)[2]

Thus, in order to prevail, defendant must show as an initial matter that a Los Angeles County deputy sheriff's compliance with *state* procedure is pivotal to the validity of an arrest under the *federal* Constitution. ■ We requested supplemental briefing to determine whether defendant's arrest, notwithstanding its constitutionality under *Atwater*, became unconstitutional because it assertedly was not authorized by section 40302(a).[3]

---

[2]Although Justice Brown apparently views it as "[u]nfortunate[]," we are nonetheless bound to follow "the Supreme Court's modern Fourth Amendment jurisprudence." (Conc. & dis. opn., *post*, at p. 631.)

[3]Justice Werdegar contends, mistakenly, that settled principles of judicial restraint direct us to refrain from resolving this issue. (See conc. opn., *post*, at p. 627.) But the cases invoking the principle of judicial restraint to avoid deciding a constitutional issue involve constitutional issues that are *parallel* to the statutory issues in the case. Thus, in *Lyng v. Northwest Indian Cemetery Prot. Assn.* (1988) 485 U.S. 439 [108 S.Ct. 1319, 99 L.Ed.2d 534], where the Native American respondents argued that the proposed governmental action would violate the free exercise clause of the First Amendment and certain federal statutes, the courts were directed "to determine, before addressing the constitutional issue, whether a decision on that question could have entitled respondents to relief beyond that to which they were entitled on their statutory claims. If no additional relief would have been warranted, a constitutional decision would have been unnecessary and therefore inappropriate." (*Id.* at p. 446 [108 S.Ct. at p. 1324]; accord, *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 228, 230-231 [45 Cal.Rptr.2d 207, 902 P.2d 225] [where tax was challenged as violative of state law and the state Constitution, it was proper to begin with the statutory challenge]; see also *Pearl v. Workers' Comp. Appeals Bd.* (2001) 26 Cal.4th 189, 196, fn. 3 [109 Cal.Rptr.2d 308, 26 P.3d 1044] [having determined the statute was "inapplicable," it was unnecessary to determine whether the statute unconstitutionally interfered with vested pension rights]; *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 128 [105 Cal.Rptr.2d 46, 18 P.3d 1198] [addressing the statutory grounds first, when independent statutory and constitutional grounds are asserted]; *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 720-721 [34 Cal.Rptr.2d 898, 882 P.2d 894] [same].) By contrast, the constitutional issue here, rather than being *parallel* to the statutory issue, is a *predicate* for it.

The appropriate jurisprudential approach, in our view, can be derived from the qualified immunity case law, which deems the existence of the asserted constitutional right a predicate to the determination whether the right allegedly implicated was clearly established at the time the officer acted. (*Wilson v. Layne* (1999) 526 U.S. 603, 609 [119 S.Ct. 1692, 1696-1697, 143 L.Ed.2d 818].) The rationale for this approach is a practical one: "if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly

This is a rickety foundation on which to base a federal constitutional argument. It is a well-settled part of " 'Our Federalism' " that "the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." (*Younger v. Harris* (1971) 401 U.S. 37, 44 [91 S.Ct. 746, 750, 27 L.Ed.2d 669].) "[A]nxious though it may be to vindicate and protect federal rights and federal interests," the federal government "always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." (*Ibid.*) For this reason, the United States Supreme Court has repeatedly resisted efforts to invoke the federal Constitution to force state officials to comply with state law. (See Woolhandler, *The Common Law Origins of Constitutionally Compelled Remedies* (1997) 107 Yale L.J. 77, 161 ["Such a decision seems inevitable if there is any continuing wish to maintain a federal system"].) ■ Rather, where state officials have been derelict under state law, the high court has reminded us that the illegality of such conduct "under the state statute can neither add to nor subtract from its constitutional validity. Mere violation of a state statute does not infringe the federal Constitution. [Citation.] And state action, even though illegal under state law, can be no more and no less constitutional under the Fourteenth Amendment than if it were sanctioned by the state legislature." (*Snowden v. Hughes* (1944) 321 U.S. 1, 11 [64 S.Ct. 397, 402, 88 L.Ed. 497].)

■ To assert (as defendant does) that state law can transform constitutional police conduct into its opposite would unravel our federal system, since treating a state law violation as a violation of the Constitution "is to

settled rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or nonconstitutional." (*County of Sacramento v. Lewis* (1998) 523 U.S. 833, 841, fn. 5 [118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043].) Similar practical concerns are present here. After *Atwater*, it is apparent that the federal Constitution imposes few limits on police discretion to arrest for the most minor of offenses. The task of cabining officer discretion in this state must therefore be shouldered by statutes enacted by the Legislature, local government ordinances, and police department regulations and guidelines. If the responsible decisionmakers are under the misapprehension that these efforts to guide officer discretion are freighted with the harsh sanction of excluding relevant evidence for their violation, few will endeavor to create them. (See *United States v. Caceres* (1979) 440 U.S. 741, 755-756 [99 S.Ct. 1465, 1473-1474, 59 L.Ed.2d 733] ["we cannot ignore the possibility that a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures. . . . [T]he result might well be fewer and less protective regulations"].)

Finally, we find it telling that the United States Supreme Court has not adopted Justice Werdegar's understanding of judicial restraint in analogous situations involving the interplay between state law and the Fourth Amendment (e.g., *California v. Greenwood* (1988) 486 U.S. 35, 43 [108 S.Ct. 1625, 1630, 100 L.Ed.2d 30] (*Greenwood*); *Sibron v. New York* (1968) 392 U.S. 40, 60-62 & fn. 20 [88 S.Ct. 1889, 1901-1902, 20 L.Ed.2d 917] (*Sibron*)), nor did any of the federal or state courts that have addressed this precise issue.

make the federal government the enforcer of state law." (*Archie v. City of Racine* (7th Cir. 1988) 847 F.2d 1211, 1217 (in bank).) This, of course, is precisely what the federal Constitution forbids. "A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." (*Pennhurst State School & Hosp. v. Halderman* (1984) 465 U.S. 89, 106 [104 S.Ct. 900, 910, 79 L.Ed.2d 67] (*Pennhurst*).) "If the alchemist's wand can transmute a violation of state law into a violation of the Constitution, *Pennhurst* will be for naught, federal enforcement of state law the order of the day." (*Archie v. City of Racine*, *supra*, 847 F.2d at p. 1217.)

It will come as no surprise, then, that the United States Supreme Court has never ordered a state court to suppress evidence that has been gathered in a manner consistent with the federal Constitution but in violation of some state law or local ordinance.[4] To the contrary, the high court has repeatedly emphasized that the Fourth Amendment inquiry does not depend on whether the challenged police conduct was authorized by state law.

In *Cooper v. California* (1967) 386 U.S. 58 [87 S.Ct. 788, 17 L.Ed.2d 730] (*Cooper*), for example, the defendant complained that the search of his vehicle was not authorized by California's forfeiture statute and was thus unconstitutional. The court found instead that the state law inquiry and the constitutional inquiry were distinct: "the question here is not whether the search was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment." (*Id.* at p. 61 [87 S.Ct. at p. 790]; see also *Sibron*, *supra*, 392 U.S. at p. 61 [88 S.Ct. at p. 1902].) More recently, the court has observed that although individual states may construe their own laws as imposing more stringent constraints on police conduct than does the federal Constitution, "[w]e have never intimated . . . that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs." (*Greenwood*, *supra*, 486 U.S. at p. 43 [108 S.Ct. at p. 1630].) "In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither

---

[4] "[T]he fact of the matter is . . . that the Supreme Court has *never* taken the position that an arrest made on probable cause violates the Fourth Amendment merely because a taking of custody was deemed unnecessary (as a matter of state law or otherwise)." (1 LaFave, Search and Seizure (3d ed. 1996) § 1.5(b), p. 141.)

enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." (*Elkins v. United States* (1960) 364 U.S. 206, 223-224 [80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669] (*Elkins*).)

Our determination of the validity of the search under the federal Constitution thus does not depend on whether "it was authorized by state law" (*Cooper, supra,* 386 U.S. at p. 61 [87 S.Ct. at p. 790]) or "the law of the particular State in which the search occurs" (*Greenwood, supra,* 486 U.S. at p. 43 [108 S.Ct. at p. 1630]). According to *Elkins, supra,* 364 U.S. at page 224 [80 S.Ct. at page 1447], the test "is one of federal law"—and, in this case, was disposed of by *Atwater.* Therefore, we need not consider whether defendant's arrest complied with section 40302(a).

Defendant, however, argues that a different line of Supreme Court authority makes state procedure relevant to the constitutional calculus. He begins with *United States v. Di Re* (1948) 332 U.S. 581 [68 S.Ct. 222, 92 L.Ed. 210] (*Di Re*). Di Re was convicted in federal court of knowingly possessing counterfeit gasoline coupons, which were found on his person following his arrest "by a state officer accompanied by federal officers who had no power of arrest." (*Id.* at p. 591 [68 S.Ct. at p. 227].) The government sought to justify the search as incident to the arrest. The court stated that because "[n]o act of Congress lays down a general federal rule for arrest without warrant for federal offenses" (*ibid.*), the rule would be that "the law of the state where an arrest without warrant takes place determines its validity." (*Id.* at p. 589 [68 S.Ct. at p. 226].) The law of New York, where the arrest occurred, permitted an arrest where " 'a felony has in fact been committed' " and the officer " 'has reasonable cause for believing the person to be arrested to have committed it.' " (*Id.* at p. 589, fn. 7 [68 S.Ct. at p. 226].) Finding no probable cause to effect the arrest, the court affirmed the order suppressing the evidence seized during the search incident. (*Id.* at pp. 593-595 [68 S.Ct. at pp. 228-229].)

Drawing on *Di Re*'s adoption of state law as a general federal rule of arrest, defendant submits that *Di Re* compels us to measure the constitutionality of this warrantless arrest under California law in general and under section 40302(a) in particular. If *Di Re* had grounded its adoption of state law on the federal Constitution, defendant's submission would be sound. Unfortunately for defendant, the court did not do so.

A review of *Di Re* reveals that its adoption of state arrest procedure was a matter of statutory construction, not constitutional compulsion. The court

derived its rule for arrests without a warrant from congressional enactments for arrests *with* a warrant. "By one of the earliest acts of Congress, the principle of which is still retained, the arrest by judicial process for a federal offense must be 'agreeably to the usual mode of process against offenders in such State.' There is no reason to believe that state law is not an equally appropriate standard by which to test arrest without warrant, except in those cases where Congress has enacted a federal rule. Indeed the enactment of a federal rule in some specific cases seems to imply the absence of any general federal law of arrest." (*Di Re, supra,* 332 U.S. at pp. 589-590 [68 S.Ct. at p. 226].) The court thus was faced with an issue squarely within its supervisory power: the choice of law by which to measure the validity of arrests in federal prosecutions. Nowhere in its discussion did the court rely on or even mention the federal Constitution. Rather, the high court, in a federal prosecution, exercised its supervisory role over the federal courts—as the lower federal courts and other state courts have concluded. (E.g., *U.S. v. Wright* (6th Cir. 1994) 16 F.3d 1429, 1435 (*Wright*); *Fields v. City of South Houston, Texas* (5th Cir. 1991) 922 F.2d 1183, 1189-1190, fn. 7; *Street v. Surdyka* (4th Cir. 1974) 492 F.2d 368, 372, fn. 7; *People v. Dyla* (1988) 142 A.D.2d 423, 434-435 [536 N.Y.S.2d 799, 806].) Commentators, too, have noted *Di Re*'s nonconstitutional foundation. (E.g., 1 LaFave, Search and Seizure, *supra,* § 1.5(b), p. 138 ["a close inspection of the *Di Re* decision indicates that the use of state law there was 'based on nonconstitutional considerations' "]; 2 Ringel, Searches and Seizures, Arrests and Confessions (2d ed. 1979) § 23.9, p. 23-71 ["Suppression of evidence resulting from the illegal, but not unconstitutional, arrest is not mandated"].) Accordingly, the high court has cited this aspect of *Di Re* only in other federal prosecutions. (See *United States v. Watson* (1976) 423 U.S. 411, 420-421, fn. 8 [96 S.Ct. 820, 826-827, 46 L.Ed.2d 598]; *Miller v. United States* (1958) 357 U.S. 301, 305-306 [78 S.Ct. 1190, 1193-1194, 2 L.Ed.2d 1332]; *Johnson v. United States* (1948) 333 U.S. 10, 15 & fn. 5 [68 S.Ct. 367, 370, 92 L.Ed. 436].)[5]

Without *Di Re*, defendant is left only with dicta. In *Ker v. California* (1963) 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726] (*Ker*), a *plurality* of the high court observed that "the lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution. [Citations.] *A fortiori*, the lawfulness of these arrests by state officers for state offenses is to be determined by California law." (*Id.* at p. 37 [83 S.Ct. at p. 1632] (lead opn. of Clark, J.).) Since the police

---

[5]It is also worth noting that the statute relied on by *Di Re* "has been amended and no longer requires that an arrest be agreeable to the usual state process." (*Wright, supra,* 16 F.3d at p. 1435, citing 18 U.S.C. § 3041.)

had complied with California law (*id.* at p. 38 [83 S.Ct. at p. 1632]), the plurality's observation was dictum.

In *Michigan v. DeFillippo* (1979) 443 U.S. 31 [99 S.Ct. 2627, 61 L.Ed.2d 343] (*DeFillippo*), the court stated that "whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." (*Id.* at p. 36 [99 S.Ct. at p. 2631].) This statement is as true as it is unremarkable— state law "is relevant to the validity of the arrest and search *only* as it pertains to the 'facts and circumstances' we hold constituted probable cause for arrest." (*Id.* at p. 40 [99 S.Ct. at p. 2633]; accord, *Ryan v. County of DuPage* (7th Cir. 1995) 45 F.3d 1090, 1093 ["the legality under the Fourth Amendment of an arrest for violating state law depends on that law in the following sense: there must be probable cause to believe that a state crime has been committed"].) In any event, this statement too was dictum, since (as the court immediately noted) "Respondent does not contend . . . that the arrest was not authorized by Michigan law." (*DeFillippo, supra,* at p. 36 [99 S.Ct. at p. 2631].)

When we balance it against the forceful reasoning of *Pennhurst, Elkins, Cooper,* and *Greenwood,* we cannot accept the dicta in these two opinions as a pronouncement from the United States Supreme Court that compliance with state arrest procedures is a prerequisite to the validity of an arrest under the federal Constitution. Had the court intended to condition the constitutionality of an arrest on state law, it had ample opportunity to say so in *Atwater.* But *Atwater* nowhere rested its holding on the circumstance that Texas had by statute authorized a custodial arrest for a seatbelt offense. Indeed, the court's announcement of its holding betrayed no reliance on state law: "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, *without violating the Fourth Amendment,* arrest the offender." (*Atwater, supra,* 532 U.S. at p. 354 [121 S.Ct. at p. 1557], italics added.)[6]

As for the federal courts of appeals, "[n]early every circuit to address the issue is in accord." (*U.S. v. Le* (10th Cir. 1999) 173 F.3d 1258, 1264,

---

[6]Nor does anything in *Knowles v. Iowa* (1998) 525 U.S. 113 [119 S.Ct. 484, 142 L.Ed.2d 492] "reconfirm that a court must consider state law in determining whether a search incident to an arrest satisfies the mandates of the Fourth Amendment." To the contrary, *Knowles* addressed "whether the search at issue, *authorized as it was by state law,* nonetheless violates the Fourth Amendment." (*Id.* at p. 116 [119 S.Ct. at p. 487], italics added.) The court then held that the exception for a search incident to a custodial arrest could not be applied where no custodial arrest had occurred. (*Id.* at pp. 114-116 [119 S.Ct. at pp. 486-487].) No one disputes the fact of the custodial arrest here, merely its validity.

fn. 2.) The First,[7] Second,[8] Fourth,[9] Fifth,[10] Sixth,[11] Seventh,[12] Eighth,[13] Ninth,[14] and Tenth[15] Circuits have each held that, once the officer has probable cause to believe a violation of law has occurred, the constitutionality of the arrest does not depend upon compliance with state procedures that are not themselves compelled by the Constitution. So have a number of state courts. (E.g., *State v. Jolin* (Me. 1994) 639 A.2d 1062, 1064 ["evidence obtained from an extraterritorial arrest based on probable cause should not *per se* be excluded"]; *Commonwealth v. Lyons* (1986) 397 Mass. 644 [492 N.E.2d 1142, 1144-1146] [refusing to suppress a photograph taken following an arrest that was illegal under state law]; *People v. Burdo* (1974) 56 Mich.App. 48 [223 N.W.2d 358, 360] ["defendant's arrest was not constitutionally invalid, but rather merely statutorily illegal; therefore the per se exclusionary rule is not applicable" (fn. omitted)]; *State v. Eubanks* (1973) 283 N.C. 556 [196 S.E.2d 706, 709] ["We hold that nothing in our law requires the exclusion of evidence obtained following an arrest which is constitutionally valid but illegal for failure to first obtain an arrest warrant"]; *State v. Droste* (1998) 83 Ohio St.3d 96 [697 N.E.2d 620, 623] ["We have stated on many occasions that absent a violation of a constitutional right, the

---

[7]*Vargas-Badillo v. Diaz-Torres* (1st Cir. 1997) 114 F.3d 3, 6 (violation of state law cannot support a claim for illegal arrest under 42 U.S.C. § 1983).

[8]*U.S. v. Santa* (2d Cir. 1999) 180 F.3d 20, 25; *id.* at pages 30-31 (conc. opn. of Newman, J.) (upholding an arrest based on a warrant that had previously been vacated, citing *Arizona v. Evans* (1995) 514 U.S. 1 [115 S.Ct. 1185, 131 L.Ed.2d 34], even though an arrest based on a vacated warrant is invalid under New York law).

[9]*U.S. v. Van Metre* (4th Cir. 1998) 150 F.3d 339, 347 ("That the arrest may or may not have been conducted in accordance with Tennessee state law is irrelevant to our analysis"); *Street v. Surdyka, supra,* 492 F.2d at page 372 ("The states are free to impose greater restrictions on arrests, but their citizens do not thereby acquire a greater federal right").

[10]*U.S. v. Walker* (5th Cir. 1992) 960 F.2d 409, 415 ("the proper inquiry in determining whether to exclude the evidence at issue is not whether the state officials' actions in arresting him were 'lawful' or 'valid under state law' ").

[11]*Wright, supra,* 16 F.3d at page 1437 ("The fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended").

[12]*Gordon v. Degelmann* (7th Cir. 1994) 29 F.3d 295, 301 ("Because Misrac followed the procedures the Constitution prescribes for making arrests, his failure to afford Gordon additional procedures established by state law does not matter—not, at least, to a claim under the fourth amendment and [42 U.S.C.] § 1983").

[13]*U.S. v. Bell* (8th Cir. 1995) 54 F.3d 502, 504 ("An arrest by state officers is reasonable in the Fourth Amendment sense if it is based upon probable cause. . . .Thus, the district court should not have looked to Iowa law in deciding the lawfulness of Bell's arrest").

[14]*U.S. v. Mota* (9th Cir. 1992) 982 F.2d 1384, 1387 ("state law governing an arrest is irrelevant to determining whether the arrest deprived an individual of rights secured by the federal constitution or a federal statute").

[15]*United States v. Miller* (10th Cir. 1971) 452 F.2d 731, 733 (affirming the denial of the suppression motion, even though the arrest violated Oklahoma law; "the test of reasonableness in relation to Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers").

violation of a statute does not invoke the exclusionary rule"]; *State v. Rodriguez* (1993) 317 Or. 27 [854 P.2d 399, 409] ["Because the arrest in this case did not violate the Fourth Amendment, the guns discovered in the subsequent consent search were not subject to suppression under the Fourth Amendment, even if the arrest violated Article I, section 9, of the Oregon Constitution"]; *Penn v. Commonwealth* (1991) 13 Va.App. 399 [412 S.E.2d 189, 193-194] ["the fact that Virginia has adopted a more stringent statutory requirement for warrantless misdemeanor arrests committed outside the officer's presence does not mean that Penn has acquired a constitutional right"], affd. (1992) 244 Va. 218 [420 S.E.2d 713]; but see *State v. Martin* (Minn. 1977) 253 N.W.2d 404, 405-406.)[16]

The majority view is sound. What would be gained, after all, by invoking the federal Constitution to exclude evidence seized following an arrest merely because, in violation of state law, a nonuniformed police officer failed to display a badge (e.g., *Drewitt v. Pratt* (4th Cir. 1993) 999 F.2d 774, 777 [the violation of Virginia law "did not rise to a violation of a federal constitutional magnitude"]), a uniformed officer effected an arrest beyond the officer's territorial limit (e.g., *People v. Wolf* (Colo. 1981) 635 P.2d 213, 217-218 [denying the suppression motion "[d]espite the fact that the Denver police violated the statutes governing their authority to arrest"]), or a deputy's commission suffered from technical administrative deficiencies (e.g., *U.S. v. Jones* (5th Cir. 1999) 185 F.3d 459, 462-463 [state law deficiency "does not affect our analysis" of the constitutional issue])? "The exclusionary rule was created to discourage violations of the Fourth Amendment, not violations of state law." (*U.S. v. Walker, supra*, 960 F.2d at p. 415.) Constitutionalizing the myriad of technical state procedures that govern arrests would not only trivialize Fourth Amendment protections but would discourage states from even enacting such rules. (Cf. *United States v. Caceres, supra*, 440 U.S. at pp. 755-756 [99 S.Ct. at pp. 1473-1474].)

Against this array of authority, defendant has identified only one court that has excluded evidence under the authority of the federal Constitution for an officer's failure to comply with state arrest procedures. In *U.S. v. Mota, supra*, 982 F.2d 1384 (*Mota*), the Ninth Circuit held that the failure of state

---

[16]Some jurisdictions have held that the commission of a *civil* infraction cannot support a custodial arrest. (E.g., *Barnett v. U.S.* (D.C. 1987) 525 A.2d 197, 198-199 & fns. 2, 5; *Thomas v. State* (Fla. 1993) 614 So.2d 468, 470-471.) In California, however, traffic infractions have not been decriminalized. (See *People v. Carlucci* (1979) 23 Cal.3d 249, 257-258 [152 Cal.Rptr. 439, 590 P.2d 15]; *Tracy v. Municipal Court* (1978) 22 Cal.3d 760, 765 & fn. 4 [150 Cal.Rptr. 785, 587 P.2d 227]; compare §§ 40000.1 and 42001 with §§ 40200 and 40203.5, subd. (b) [defining parking fines as "civil penalties"].) Other states have relied on their own constitutions to bar evidence seized in violation of state law. (E.g., *State v. Hehman* (1978) 90 Wash.2d 45 [578 P.2d 527, 529].)

police officers to comply with state procedures rendered the arrest unreasonable under the Fourth Amendment and suppressed the fruits of a subsequent search incident to the arrest. (*Id.* at pp. 1388-1389.) The Mota brothers were arrested for operating a food cart without a business license in violation of a Santa Ana municipal ordinance. A search incident to arrest uncovered 41 counterfeit $20 bills. (*Id.* at pp. 1386-1387.) California law, however, did not authorize a custodial arrest for this infraction unless the arrestee had refused to present satisfactory evidence of identity or sign a written promise to appear. (*Id.* at pp. 1388-1389.)

In suppressing the evidence based on this violation of state procedure, the Ninth Circuit acknowledged its prior rulings that application of the exclusionary rule is a matter of federal law (*Mota, supra,* 982 F.2d at p. 1387) and that "in the context of a suit brought under 42 U.S.C. § 1983, . . . state law governing an arrest is irrelevant to determining whether the arrest deprived an individual of rights secured by the federal constitution or a federal statute" (*ibid.,* citing *Barry v. Fowler* (9th Cir. 1990) 902 F.2d 770, 772 (*Barry*)). Conceding that other circuits had ruled otherwise, the court nonetheless deemed itself bound by *Di Re, DeFillippo,* and *Ker* (which it failed to note was a plurality opinion) to exclude the evidence. (*Mota, supra,* at pp. 1387-1388.) We find *Mota* unpersuasive.

First, as discussed above, *Di Re, DeFillippo,* and *Ker* do not constitutionalize state arrest procedures. Much more on point, we think, are *Cooper* and *Greenwood* (which were not cited in *Mota*) and *Atwater* (which was decided after *Mota*), all of which emphasize that state procedures are irrelevant to the Fourth Amendment inquiry.

Second, *Mota*'s holding that the custodial arrest was constitutionally unreasonable because it failed to comply with state procedure is utterly inconsistent with the Ninth Circuit's earlier holding in *Barry* that "state law governing an arrest is irrelevant to determining whether the arrest deprived an individual of rights secured by the federal constitution or a federal statute." (*Mota, supra,* 982 F.2d at p. 1387.)

Defendant attempts to reconcile these inconsistent rulings by quoting Professor LaFave as suggesting that the Ninth Circuit "might have more precisely said that though the arrest was constitutional despite the violation of state law, the incidental search was not because [*United States v.*] *Robinson* [(1973) 414 U.S. 218 [94 S.Ct. 467, 38 L.Ed.2d 427]] imposes as a prerequisite not just a constitutional arrest but, more demandingly, a 'lawful custodial arrest.' " (1 LaFave, Search and Seizure, *supra,* § 1.5(b), p. 141.) What defendant fails to include is Professor LaFave's cogent rebuttal to this

alternative interpretation: "[I]t must be asked whether the court was correct in reaching the essential conclusion that the *Robinson* test mandates 'reference to state law governing the arrest.' That is, when the Court in *Robinson* said 'lawful custodial arrest,' did the Court really mean an arrest which is lawfully custodial in a state law sense? Some of the Supreme Court's language suggests otherwise. Just before the 'lawful custodial arrest' holding, there appears this sentence: 'A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.' That seems to say that 'lawful' refers not to the limitations of state law but rather to an overarching principle that all it takes to make a custodial arrest reasonable in a Fourth Amendment sense is that it be based on probable cause. And thus it must be concluded that both of the alternative interpretations of the *Mota* holding are open to question." (*Id.* at § 1.5(b), pp. 141-142; cf. *United States v. Caceres, supra,* 440 U.S. at pp. 751-755 [99 S.Ct. at pp. 1471-1473] [refusing to suppress taped conversations that were obtained in violation of Internal Revenue Service regulations that were not themselves compelled by the Constitution].)

■ Conditioning a search incident to arrest on the degree to which an otherwise constitutional arrest complies with state procedure, moreover, makes no sense. The justification for a search incident to arrest rests on "(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial." (*Knowles v. Iowa, supra,* 525 U.S. at p. 116 [119 S.Ct. at p. 487].) Neither the need to disarm the suspect nor the need to preserve evidence depends upon the arrest's compliance with state law.

Third, *Mota*'s reliance on *Welsh v. Wisconsin* (1984) 466 U.S. 740 [104 S.Ct. 2091, 80 L.Ed.2d 732] is misplaced. *Welsh* held that "an important factor to be considered when determining whether any exigency exists [to effect a warrantless arrest in the home] is the gravity of the underlying offense for which the arrest is being made." (*Id.* at p. 753 [104 S.Ct. at p. 2099].) In that case, the offense was "a noncriminal violation" subject to a civil forfeiture proceeding. (*Id.* at p. 746 [104 S.Ct. at p. 2095].) *Welsh,* however, nowhere suggests that the validity of a warrantless arrest not based on exigent circumstances depends on a weighing of "the state's assessment of the gravity of the offense justifying the arrest" or "the state's expression of disinterest in allowing warrantless arrests for mere infractions." (*Mota, supra,* 982 F.2d at pp. 1388-1389.) Any doubt on this score was resolved by *Atwater,* in which the court said: "we confirm today what our prior cases have intimated: the standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.'" (*Atwater, supra,* 532 U.S. at p. 354 [121 S.Ct. at p. 1557].)

Last, *Mota*'s analogy between inventory searches and arrests is faulty. *Mota* sought guidance from another Ninth Circuit decision, *U.S. v. Wanless* (9th Cir. 1989) 882 F.2d 1459, which construed *South Dakota v. Opperman* (1975) 428 U.S. 364 [96 S.Ct. 3092, 49 L.Ed.2d 1000] and *Colorado v. Bertine* (1987) 479 U.S. 367 [107 S.Ct. 738, 93 L.Ed.2d 739] to require compliance with local police department procedures to uphold an inventory search. Leaving to one side the issue of whether the high court's directive that inventory searches "be conducted according to standardized criteria" (*Bertine, supra*, 479 U.S. at p. 374, fn. 6 [107 S.Ct. at p. 742]) necessarily requires compliance to the letter with every local procedure, those cases cannot be read to undermine an arrest that—unlike an inventory search, an administrative inspection, or a random traffic stop—is justified by probable cause. (See *Whren v. United States* (1996) 517 U.S. 806, 811-812, 817-818 [116 S.Ct. 1769, 1773-1774, 1776-1777, 135 L.Ed.2d 89].) The absence of standardized local procedures is not fatal to an arrest or a search incident thereto. As the United States Supreme Court explained in upholding the search incident to an arrest for another minor traffic violation, "Though the officer here was not required to take the petitioner into custody by police regulations . . . and there did not exist a departmental policy establishing the conditions under which a full-scale body search should be conducted, we do not find these differences determinative of the constitutional issue. [Citation]. It is sufficient that the officer had probable cause to arrest the petitioner and that he lawfully effectuated the arrest and placed the petitioner in custody." (*Gustafson v. Florida* (1973) 414 U.S. 260, 265 [94 S.Ct. 488, 491-492, 38 L.Ed.2d 456] (*Gustafson*).)

 In sum, we find *Cooper, Elkins, Gustafson, Greenwood,* and *Atwater* more persuasive and conclude that so long as the officer has probable cause to believe that an individual has committed a criminal offense, a custodial arrest—even one effected in violation of state arrest procedures—does not violate the Fourth Amendment. In this case, then, it is of no moment that defendant's arrest assertedly violated the procedures set forth in section 40302(a) since (as defendant concedes) Deputy Valento had probable cause to believe defendant had violated a provision of the Vehicle Code.

 By this decision, we in no way countenance violations of state arrest procedure. As we explained at the outset, Proposition 8 left intact the substantive scope of state statutory and constitutional rights against arrest for minor offenses. Violation of those rights exposes the peace officers and their departments to civil actions seeking injunctive or other relief. (*Garrett v. City of Bossier City* (La.Ct.App. 2001) 792 So.2d 24, 26-28 [although the arrest for a seatbelt offense was constitutional under *Atwater*, the arrest's failure to comply with state procedure supported a private civil suit]; see

generally *People v. Mayoff* (1986) 42 Cal.3d 1302, 1318 [233 Cal.Rptr. 2, 729 P.2d 166] (plur. opn. of Grodin, J.).) Violation of those state rights also may subject the offending officer to an internal investigation, additional training, and departmental discipline. (See Heffernan, *Foreword: The Fourth Amendment Exclusionary Rule as a Constitutional Remedy* (2000) 88 Geo. L.J. 799, 865 ["A direct sanction imposed on individual officers—internal police discipline, for example—is likely to channel police behavior into patterns of legal conduct far more effectively than does the indirect sanction of exclusion"].) What we cannot do, out of respect for the supremacy clause and Proposition 8, is " 'impose such greater restrictions as a matter of federal constitutional law when [the United States Supreme] Court specifically refrains from imposing them.' " (*Arkansas v. Sullivan* (2001) 532 U.S. 769, 772 [121 S.Ct. 1876, 1878, 149 L.Ed.2d 994], italics omitted, quoting *Oregon v. Hass* (1975) 420 U.S. 714, 719 [95 S.Ct. 1215, 1219, 43 L.Ed.2d 570].)

Moreover, by removing the threat that relevant evidence will be excluded for violation of their rules, our decision today may have the salutary effect of encouraging state and local governments as well as individual police departments to seize the opportunity *Atwater* presents to craft careful and detailed regulations governing the ability of officers to arrest for minor offenses. (See *People v. Mayoff, supra,* 42 Cal.3d at pp. 1318-1319; cf. *County of Sacramento v. Lewis, supra,* 523 U.S. at p. 841, fn. 5 [118 S.Ct. at p. 1714].) Thus, eliminating the sanction of exclusion does not mean that affected individuals or the public generally are without remedy against a wayward officer. "We, the judiciary, cannot claim that we and we alone wield the only power or possess the only wisdom to enforce rules." (*People v. Hoag* (2000) 83 Cal.App.4th 1198, 1215 [100 Cal.Rptr.2d 556] (conc. opn. of Morrison, J.).)

2

Even if compliance with state procedure were a predicate to the constitutionality of defendant's arrest under the Fourth Amendment, he still would not be entitled to relief in this proceeding, since (as we conclude) his arrest did not violate section 40302(a).

Our state law authorizes custodial arrests for violations of the Vehicle Code, but not in all circumstances. If the violation is declared to be a felony, the offender is to be dealt with in like manner "as upon arrest for the commission of any other felony." (Veh. Code, § 40301; see Pen. Code, § 836.) For certain enumerated nonfelony offenses, the officer has the discretion to take the offender to "the nearest or most accessible" magistrate with jurisdiction over the offense *or* to issue a citation and, upon the offender's signature of a promise to appear, release the offender. (§§ 40303,

40304.) For the remaining offenses (except driving under the influence), the officer must follow the cite-and-release procedure, unless the offender fails to present a driver's license or other satisfactory evidence of identity for examination, refuses to give a written promise to appear in court, or demands an immediate appearance before a magistrate, in which case the officer must take the offender to the magistrate. (§ 40302; *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 199-200 [101 Cal.Rptr. 837, 496 P.2d 1205].) The Legislature thus "in effect presumes that in the vast majority of cases the violator will not be taken into custody." (*Simon, supra*, at p. 199.)

The parties agree that the arrest here is governed by section 40302, which states in pertinent part: "Whenever any person is arrested for any violation of this code, not declared to be a felony, the arrested person shall be taken without unnecessary delay before a magistrate within the county in which the offense charged is alleged to have been committed and who has jurisdiction of the offense and is nearest or most accessible with reference to the place where the arrest is made in any of the following cases: [¶] (a) When the person arrested fails to present his driver's license or other satisfactory evidence of his identity for examination." The parties disagree over whether Deputy Valento complied with this provision. The Attorney General argues that defendant's custodial arrest was justified under section 40302(a) by his failure "to present his driver's license or other satisfactory evidence of his identity for examination." Defendant, on the other hand, argues that section 40302(a) cannot be used to justify his arrest because he told the officer his name and birthdate and thus provided "other satisfactory evidence of his identity." This case therefore turns on the meaning of the requirement in section 40302(a) that the offender "present his driver's license or other satisfactory evidence of his identity for examination."

One part of the statute requires little construction. An offender may avoid a custodial arrest by presenting a driver's license to the officer for examination. So long as the license is current, valid, and raises no suspicion that it has been altered or falsified, section 40302(a) does not require a custodial arrest. On this point, there is no dispute.

There is likewise no dispute that at least one category of identification qualifies as "other satisfactory evidence of . . . identity"—those forms of documentary evidence that are the functional equivalent of a driver's license. This would include a state-issued identification card (§ 13005) and other current, reliable documentary evidence of identity that, like a driver's license, bears the person's photograph, physical description, current mailing address, and signature, and is serially or otherwise numbered. (See Veh. Code, § 12811; cf. Civ. Code, § 1185, subd. (c) [defining " 'satisfactory

evidence' " to identify the person acknowledging an instrument before a notary].)

Here, of course, defendant did not present a driver's license or other documentary evidence of his identity. He contends, though, that "[n]othing in the code section provides that the person to be cited must present documentary evidence of his identity," merely "satisfactory evidence of . . . identity." Defendant offers an incomplete reading of the statute.

■ " 'In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose . . . .' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 634 [59 Cal.Rptr.2d 671, 927 P.2d 1175], quoting *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873].) ■ The statute here directs the offender to "*present* his driver's license or other satisfactory evidence of his identity *for examination.*" (§ 40302, subd. (a), italics added; cf. Tenn. Code Ann. § 40-7-118(c)(3) ["No citation shall be issued under the provisions of this section if [¶] . . . [¶] . . . [t]he person arrested cannot or will not offer satisfactory evidence of identification . . . ."].) By the italicized language, the Legislature plainly contemplated that the evidence of identity be capable of presentation and examination, acts that are ordinarily performed on tangible objects. Prior to the 1968 amendment, this section permitted a custodial arrest "[w]hen the person arrested fails to *exhibit* his driver's license or other satisfactory evidence of identity." (Stats. 1963, ch. 1341, § 1, p. 2864, italics added.) The 1968 amendment (Stats. 1968, ch. 647, § 1, p. 1332) was "intended to clarify that either the driver's license or identification *must be given to the officer* rather than merely exhibited, which in some instances has been complied with by showing it through a closed window. The license and identification must be *examined* to assure validity and the presence of license restrictions." (Cal. Highway Patrol, Enrolled Bill Rep. on Assem. Bill No. 1122 (1968 Reg. Sess.) prepared for Governor Reagan (July 12, 1968), p. 1, italics added.)

This interpretation of section 40302(a)'s requirement that the offender "present" a license or other evidence of identity "for examination" is consistent with the Legislature's use of this language in other statutes. ■ (See *Stillwell v. State Bar* (1946) 29 Cal.2d 119, 123 [173 P.2d 313] ["it is a well-established rule of construction that when a word or phrase has been given a particular scope or meaning in one part or portion of a law it shall be given the same scope and meaning in other parts or portions of the law"].) Section 12951, subdivision (b), for example, provides that "[t]he driver of a motor vehicle shall present his or her license for examination upon demand

of a peace officer enforcing the provisions of this code." Section 4462, subdivision (a) requires the driver to "present the registration or identification card or other evidence of registration of any or all vehicles under his or her immediate control for examination upon demand of any peace officer." There can be little doubt that in both circumstances the driver is expected to surrender the specified document to the peace officer for examination, not merely to recite the information contained therein. When the Legislature uses the same language in section 40302(a), we can infer that the same result is intended.

By construing section 40302(a) in this manner, we do not intend to foreclose the exercise of discretion by the officer in the field in deciding whether to accept or reject other evidence—including oral evidence—of identification. It would be absurd to *require* an officer to effect a custodial arrest of an offender who is able to convince the officer, by any means, of his or her identity and willingness to appear in answer to the citation. An officer may, for example, be personally acquainted with the offender or obtain independent corroboration of the offender's identity from others present. In these and other circumstances in which the officer is convinced of the offender's identity, a custodial arrest would be unnecessary. We therefore hold that an officer has broad discretion to effect a custodial arrest under section 40302(a) unless the offender has presented a current and valid driver's license or other reliable documentary evidence of identification.

The question then arises to what extent the officer's exercise of discretion can be reviewed by a court. The mere fact that discretion has been entrusted to the officer, of course, does not warrant invalidation or revision of the statute. (*U.S. v. Trigg* (7th Cir. 1989) 878 F.2d 1037, 1041 ["The Court, however, has never indicated that the discretionary exercise of the arrest power, a power that is contingent upon a prior determination of probable cause, is constitutionally significant"].) Indeed, section 40303 leaves it completely to "the judgment of the arresting officer" whether to employ the cite-and-release procedure or to effect a custodial arrest for the offenses listed in subdivisions (a) through (q). Section 40304 does the same for non-Vehicle-Code traffic misdemeanors. Inasmuch as California could, consistent with the federal Constitution, authorize a custodial arrest for *all* Vehicle Code violations, the fact that it has delegated *some* discretion to police officers to evaluate the sufficiency of the proffered evidence of identity is, despite Justice Brown's protestations (see conc. & dis. opn., *post*, at pp. 632, 635-636), of no constitutional concern. (See *Gustafson*, *supra*, 414 U.S. at p. 265 [94 S.Ct. at pp. 491-492].) As with all discretionary enforcement decisions, the officer's choices may be challenged as being based on invalid criteria, such as race, religion, or other arbitrary classification, including the exercise of protected statutory or constitutional rights.

(See *Wayte v. United States* (1985) 470 U.S. 598, 608 [105 S.Ct. 1524, 1531, 84 L.Ed.2d 547].)[17]

Defendant interprets the statute to impose additional limits on an officer's discretion. In his view, the officer should be required to conduct sufficient inquiries calculated to elicit satisfactory evidence of identity and to accept verifiable oral evidence of identity, and the officer's failure to do so should be reviewed in the same manner as other police conduct under the Fourth Amendment. The fundamental problem with this interpretation, of course, is that the statute does not require the officer to act as defendant suggests. Rather, the statute plainly puts the burden of presenting satisfactory evidence of identity on the offender. Once the officer has made some inquiry that has put the offender on notice to produce evidence of his or her identity, the officer has done all that is required by the statute.

Moreover, defendant's proposal that the officer be required to ask a specific set of questions would facilitate the use of false identities. If, as defendant asserts, requiring the officer to ask for the offender's name, address, and date of birth "does not impose a heavy or unreasonable burden on the officer in the field," it follows that the unscrupulous offender could just as easily memorize those three bits of information, parrot it back to the officer, and thus evade responsibility for any number of Vehicle Code offenses, since the physical description available through a computer database may well be too general to adequately confirm the offender's identity. (See *Lee v. Superior Court* (2000) 22 Cal.4th 41, 43 [91 Cal.Rptr.2d 509, 989 P.2d 1277] [petitioner evaded traffic citation by falsely identifying himself as his deceased brother]; accord, Cal. Highway Patrol, Enrolled Bill Rep. on Assem. Bill No. 219 (1995-1996 Reg. Sess.) prepared for Governor Wilson (July 3, 1995) p. 1 ["there have been several occasions where individuals have misrepresented themselves when they did not have photographic identification to substantiate their identity"].) If, on the other hand, the essential litany of questions is left undefined, then the officer is without guidance as to the number of questions that should be sufficient to elicit satisfactory evidence of identity or the quantum of evidence that an officer should know would be sufficient to establish identity in each instance. Case-by-case adjudication to flesh out the prerequisites for compliance with section 40302(a) does not properly credit the state's "essential interest in readily administrable rules" or comply with the high court's directive "to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made." (*Atwater, supra,* 532 U.S. at p. 347 [121 S.Ct. at pp. 1553-1554].)

---

[17]The officer's subjective belief that a search incident to arrest might uncover evidence of a crime, however, does not invalidate an arrest under the Fourth Amendment. (*Arkansas v. Sullivan, supra,* 532 U.S. at p. 772 [121 S.Ct. at p. 1878].)

We likewise conclude that the statute does not support judicial oversight of officer discretion beyond what we have articulated above. (See *People v. Superior Court (Simon)*, *supra*, 7 Cal.3d at p. 201 ["At the very least, he must be able to convince *the officer* . . . [of] his true identity . . . . When he cannot do so the officer has no assurance the promise will be honored, and under those circumstances subdivision (a) prohibits the use of the citation procedure." (Italics added.)].) Unlike the cases meriting application of the exclusionary rule, an officer acting under section 40302(a) is hardly engaged in " ' "the often competitive enterprise of ferreting out crime." ' " (*People v. Amador* (2000) 24 Cal.4th 387, 396 [100 Cal.Rptr.2d 617, 9 P.3d 993].) Indeed, it is in the interest of the police to *limit* petty-offense arrests, which carry costs that are simply too great to incur without good reason. (*Atwater*, *supra*, 532 U.S. at p. 352 [121 S.Ct. at p. 1556]; accord, *People v. Grant* (1990) 217 Cal.App.3d 1451, 1455 [266 Cal.Rptr. 587] [describing the California Highway Patrol's policy against custodial arrests when the driver merely fails to carry a license while driving].) Defendant's complaint that "an officer should not be able to ignore readily available proof of identity" overlooks the fact that the officer has no incentive to do so.

It is one thing for a court to review an officer's decision to reject a driver's license or other documentary evidence of identification, since the item itself can be brought to the magistrate to support the officer's belief it had been altered or falsified. It is quite another to review an officer's decision to reject oral evidence of identification, since that decision will be based entirely on the officer's assessment of the offender's credibility—an assessment involving intangible factors that may be difficult to reproduce in the courtroom. There is a world of difference in making that judgment as a matter of discretion "and making the same judgment when the question is the lawfulness of the warrantless arrest itself. It is the difference between no basis for legal action challenging the discretionary judgment, on the one hand, and the prospect of evidentiary exclusion or . . . personal [42 United States Code] § 1983 liability for the misapplication of a constitutional standard, on the other." (*Atwater*, *supra*, 532 U.S. at p. 350 [121 S.Ct. at p. 1555].)

Furthermore, transferring the locus of discretion from the officer in the field to the courtroom, as defendant suggests, would have perverse results. Under section 40302(a), a custodial arrest is *mandatory* when the offender fails to present a driver's license or other satisfactory evidence of identity. Under our construction of the statute, which reserves wide discretion to the officer to determine what evidence is satisfactory, the officer is authorized to use the cite-and-release procedure whenever the officer is satisfied with the evidence of identity the offender has presented. If, instead, the determination

of what evidence is satisfactory will be made by the magistrate under the case law as it evolves, the officer will be compelled by section 40302(a) to effect a custodial arrest whenever the evidence offered by the offender does not meet the standard set forth in the case law—even if the officer is otherwise convinced of the offender's identity.

██ Defendant's final argument is not without some initial common-sense appeal: "If a person is not required by law to carry identification, he cannot be constitutionally arrested for not doing so." The flaw in defendant's argument, though, is that he was not arrested because of his failure to carry identification. Rather, he was arrested for committing a Vehicle Code infraction. A bicyclist is subject to all provisions of the rules of the road "applicable to the driver of a vehicle" (§ 21200, subd. (a)) and is subject as well to division 17 of the Vehicle Code, which includes section 40302. (§§ 231, 21200, subd. (a).) Here, of course, defendant was not arrested merely because he failed to produce a license. He was arrested because he violated the Vehicle Code. At that point, the need to obtain reliable evidence of identification and ensure compliance with a promise to appear is equally great for a bicyclist as for a driver of a motorized vehicle. Although only the latter is obligated to have a license in his or her possession at all times while driving on the road (§ 12951, subd. (a)), *both* are required to produce satisfactory evidence of identity for examination when stopped for a violation of the law. If enforcement of those laws duly enacted by the Legislature is to occur, it could hardly be otherwise. (See *People v. Mercurio* (1970) 10 Cal.App.3d 426, 430 [88 Cal.Rptr. 750] ["The statute obviously is designed to insure that the violator will be held personally responsible for a Vehicle Code violation"].)

In sum, section 40302(a) entrusts the decision whether to accept nondocumentary evidence of identity to the discretion of the arresting officer. Because defendant makes no showing that Deputy Valento exercised his discretion in an unconstitutional manner, the arrest did not violate the statute.

### III

### Disposition

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Chin, J., and Moreno, J., concurred.

**WERDEGAR, J.**—I concur in the majority's conclusion that Vehicle Code section 40302, subdivision (a) (section 40302(a)) permits a police officer to

effect a custodial arrest of a bicyclist who, having been stopped for violating a provision of the Vehicle Code, lacks satisfactory evidence of his identity. (Maj. opn., *ante*, at p. 619 et seq.) I agree that section 40302(a) contemplates an offender will produce written or other tangible evidence of identity, but that oral evidence may suffice if, in the reasonable discretion of the officer, it is "satisfactory" to ensure the citee will honor his promise to appear. Moreover, I agree section 40302(a), as interpreted, does not violate the Fourth Amendment's protection against unreasonable searches and seizures. (*Atwater v. Lago Vista* (2001) 532 U.S. 318 [121 S.Ct. 1536, 149 L.Ed.2d 549] (*Atwater*).) Accordingly, the search incident to the custodial arrest in this case, in which the officer found a baggie of methamphetamine, was permissible. (*United States v. Robinson* (1973) 414 U.S. 218 [94 S.Ct. 467, 38 L.Ed.2d 427].)

Unfortunately, the majority does not stop there or, rather, does not start and stop there, but instead addresses at the outset an unresolved and unnecessary constitutional question: whether the law permitting police to conduct a search incident to an arrest is limited to those situations, as here, in which the arrest is lawful under state law, or embraces as well an arrest that complies with the minimum constitutional requirements but violates state law. Because we conclude today that defendant's arrest complied with both statutory (§ 40302(a)) and constitutional (*Atwater, supra,* 532 U.S. 318) prerequisites, we have no need to address this further constitutional issue. The majority's extensive analysis of the question is thus no more than obiter dictum.

As the majority knows well,[1] " 'we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us.' [Citations.] As the United States Supreme Court reiterated, 'A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.' [Citation.] Applying that principle, the high court observed that if statutory relief had been adequate in the case before it, 'a constitutional decision would have been unnecessary and therefore inappropriate.' " (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230-231 [45 Cal.Rptr.2d 207, 902 P.2d 225], quoting *Lyng v. Northwest Indian Cemetery Prot. Assn.* (1988) 485 U.S. 439, 445, 446 [108 S.Ct. 1319, 1323, 1324, 99 L.Ed.2d 534]; see also *Three Affiliated Tribes v. Wold*

---

[1]See *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 128-129 [105 Cal.Rptr.2d 46, 18 P.3d 1198] (maj. opn. of Kennard, J.); *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 721 [34 Cal.Rptr.2d 898, 882 P.2d 894] (maj. opn. of Baxter, J.); *Pearl v. Workers' Comp. Appeals Bd.* (2001) 26 Cal.4th 189, 196, fn. 3 [109 Cal.Rptr.2d 308, 26 P.3d 1044] (maj. opn. of Chin, J.).

*Engineering* (1984) 467 U.S. 138, 157-158 [104 S.Ct. 2267, 2279, 81 L.Ed.2d 113]; *Ashwander v. Valley Authority* (1936) 297 U.S. 288, 346-347 [56 S.Ct. 466, 482-483, 80 L.Ed. 688] (conc. opn. of Brandeis, J.); *People v. Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].)

"Principles of judicial restraint counsel that we not reach out to decide gratuitously constitutional questions of first impression. Sound jurisprudence dictates that such issues be decided only in the context of cases and controversies actually raising the issue." (*People v. Bennett* (1998) 17 Cal.4th 373, 393 [70 Cal.Rptr.2d 850, 949 P.2d 947] (conc. opn. of Werdegar, J.).)

The majority seeks to evade this basic constitutional tenet by characterizing the constitutional issue as a "threshold" one (maj. opn., *ante*, at p. 607) and a "predicate" (*id.* at p. 608, fn. 3) to reaching the statutory issue. By so reasoning, the majority places the cart before the horse. In fact, the statutory issue (Did the arrest violate Vehicle Code section 40302?) is a predicate for the constitutional issue (*If* the arrest was bad, was the search nevertheless constitutional?). We need never reach the constitutional issue in this case because we find defendant's arrest did not violate Vehicle Code section 40302. Only in a case involving a statutory violation would we be required to continue the analysis and decide whether the fruits of a search incident to an illegal arrest nevertheless fell outside the Fourth Amendment's exclusionary rule. I would await such a case.

The majority also finds justification for its approach in its desire to reassure the Legislature, local governments and police departments that any efforts to craft laws and regulations guiding police officer discretion when making arrests will not result in the exclusion of relevant evidence as a sanction for their violation. (Maj. opn., *ante*, at pp. 608-609, fn. 3.) But as this court has often observed, " 'The rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court.' " (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 860 [39 Cal.Rptr.2d 21, 890 P.2d 43].) We need not reiterate here the problems associated with providing gratuitous constitutional decisions.[2] The ban on advisory opinions has existed from almost the beginning of our Republic (*Hayburn's Case* (1792) 2 U.S. (2 Dall.) 409 [1 L.Ed. 436]) to the present day (see, e.g., *United States v. Fruehauf* (1961)

[2]Contrary to the majority's suggestion (maj. opn., *ante*, at p. 608, fn. 3), in neither *California v. Greenwood* (1988) 486 U.S. 35 [108 S.Ct. 1625, 100 L.Ed.2d 30] nor *Sibron v. New York* (1968) 392 U.S. 40 [88 S.Ct. 1889, 20 L.Ed.2d 917] did the United States Supreme Court render a *gratuitous* constitutional decision. In both cases, the high court resolved a constitutional issue that was necessary to decide the case. The qualified immunity cases cited by the majority (*Wilson v. Layne* (1999) 526 U.S. 603 [119 S.Ct. 1692, 143 L.Ed.2d 818]; *County of Sacramento v. Lewis* (1998) 523 U.S. 833 [118 S.Ct. 1708, 140 L.Ed.2d 1043]; maj.

365 U.S. 146, 157 [81 S.Ct. 547, 553-554, 5 L.Ed.2d 476]; *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1126 [278 Cal.Rptr. 346, 805 P.2d 300]). Nor does it matter whom the advisory opinion would benefit. (*Salazar v. Eastin, supra,* at p. 860 [declining to provide advisory opinion to assist the California State Board of Education]; *Younger v. Superior Court* (1978) 21 Cal.3d 102, 119 [145 Cal.Rptr. 674, 577 P.2d 1014] [declining to provide advisory opinion to assist court clerks]; *People ex rel. Lynch v. Superior Court* (1970) 1 Cal.3d 910, 912 [83 Cal.Rptr. 670, 464 P.2d 126] [declining to provide advisory opinion to assist law enforcement]; *Denny's, Inc. v. City of Agoura Hills* (1997) 56 Cal.App.4th 1312, 1329, fn. 10 [66 Cal.Rptr.2d 382] [declining to provide advisory opinion to assist a city in drafting a permissible ordinance].) Thus, that such constitutional guidance would be potentially useful to legislative, governmental or law enforcement entities in discharging their duties is an insufficient reason to disregard the prohibition on advisory opinions.

Our decision finding defendant's arrest valid under section 40302(a) renders it unnecessary to consider whether a search incident to an arrest in violation of a state law could nevertheless be constitutionally valid. Accordingly, I concur in the opinion with the exception of part II.B.1, about which I express no opinion.

**BROWN, J.,** Concurring and Dissenting.—As Justice Jackson warned in 1949: "We must remember that the extent of any privilege of search and seizure without warrant which we sustain, the officers interpret and apply themselves and will push to the limit. . . . [¶] . . . [¶] And we must remember that the authority which we concede to conduct searches and seizures without warrant may be exercised by the most unfit and ruthless officers as well as by the fit and responsible, and resorted to in case of petty misdemeanors as well as in the case of the gravest felonies." (*Brinegar v. United States* (1949) 338 U.S. 160, 182 [69 S.Ct. 1302, 1314, 93 L.Ed. 1879] (dis. opn. of Jackson, J.).) From what we know of human nature, this observation seems unassailable: for every inch given, a mile will be taken.

This is a case about pushing to the limits and beyond. The majority concludes Vehicle Code section 40302, subdivision (a) (section 40302(a))[1] permits the full custodial arrest of a bicyclist for failure to produce written or other tangible proof of identity when the arresting officer, in the exercise of his unfettered and unreviewable discretion, rejects proffered oral evidence. I disagree with the majority's interpretation of section 40302(a). Moreover, I

opn., *ante,* at p. 608, fn. 3) are also inapposite for in neither case did the high court give priority to a constitutional question in derogation of a statutory one.

[1]All statutory references are to the Vehicle Code unless otherwise indicated.

am not convinced the search incident to the custodial arrest—which is authorized solely as a result of the officer's decision to reject the offender's oral identification—is constitutionally permissible.

Mr. McKay was sentenced to a prison term for the trivial *public offense* of riding a bicycle the *wrong way* on a residential street. Well . . . not exactly.

Deputy Valento observed Mr. McKay riding the "wrong way" on a residential street—a minor violation of the Vehicle Code.[2] It was, in fact, such a minor offense that it hardly seems worth the officer's time to issue a citation. There is no indication Mr. McKay was creating any risk or threatening the public safety in any way. Not surprisingly, Mr. McKay did not have a driver's license with him. No license is required to operate a bicycle. He identified himself by telling the deputy his name and date of birth. Without making any effort to confirm McKay's identity, the officer decided instead to arrest him. In California an officer is required to arrest a person who "fails to present his driver's license or other satisfactory evidence of his identity for examination" after being arrested for a violation of the Vehicle Code. (§ 40302(a).) Well . . . not exactly.[3]

So what makes such minor lawbreaking worthy of attention? What if Mr. McKay rides a bicycle because he does not have a driver's license? What if, being a dedicated libertarian, he deliberately eschews all forms of government-issued identification? What if not being photographed is a tenet of his religious faith? No matter. The result according to the majority is that Mr. McKay may be subjected to a full custodial arrest, have himself and his possessions thoroughly searched, have contraband unrelated to the observed public offense or to concerns about officer safety seized and used in the prosecution of a new crime.

The majority's approach is flawed in two ways. First, its interpretation of *Atwater v. Lago Vista* (2001) 532 U.S. 318 [121 S.Ct. 1536, 149 L.Ed.2d 549] (*Atwater*) turns a California procedural rule, enacted to lessen the degree of constitutional intrusion when people are detained for minor offenses, into a general warrant—a result that cannot be reconciled with the

---

[2] Section 21650.1 provides: "A bicycle operated on a roadway, or the shoulder of a highway, shall be operated in the same direction as vehicles are required to be driven upon the roadway."

[3] The Legislature recognizes that bike riders need not have a driver's license. "When a minor is cited for an offense not involving the driving of a motor vehicle, the minor shall not be taken into custody pursuant to subdivision (a) of Section 40302 solely for failure to present a driver's license." (§ 40302.5.) Nor is the arrest of an adult who does not have a license in his possession mandatory. "If the arrestee does not have a driver's license or other satisfactory evidence of identity in his or her possession, the officer may require the arrestee to place a right thumbprint . . . on the notice to appear." (§ 40500, subd. (a).)

historical context of the Fourth Amendment. Second, the majority interpretation of section 40302(a) makes the failure to carry documentary proof of identification *at all times* an arrestable public offense—solely at the officer's discretion. Since the failure to carry documentary proof of identity is not itself a criminal offense, unreviewable discretion of such breadth cannot be squared with concerns about notice, due process, and discriminatory enforcement.

Thus, while I agree with the majority's conclusion in part II.B.1 that noncompliance with state procedures does not affect the validity of an arrest under the federal Constitution without an independent violation of the Fourth Amendment, I conclude that on these facts the arrest and search of defendant were unreasonable and therefore unconstitutional.

## I.

The majority insists this result is compelled by *Atwater*. I do not think so. In *Atwater*, the high court ruled that an arrest for a very minor criminal offense is not per se unreasonable under the Fourth Amendment. (*Atwater*, *supra*, 532 U.S. at pp. 353-354 [121 S.Ct. at p. 1557].) It is also true that the court had previously authorized broad searches incident to arrest (see *United States v. Robinson* (1973) 414 U.S. 218 [94 S.Ct. 467, 38 L.Ed.2d 427] (*Robinson*); *United States v. Gustafson* (1973) 414 U.S. 260 [94 S.Ct. 488, 38 L.Ed.2d 456]; *New York v. Belton* (1981) 453 U.S. 454 [101 S.Ct. 2860, 69 L.Ed.2d 768] (*Belton*)), and placed its imprimatur on pretextual traffic stops (*Whren v. United States* (1996) 517 U.S. 806 [116 S.Ct. 1769, 135 L.Ed.2d 89] (*Whren*)).

Nevertheless, the "touchstone" of the Fourth Amendment remains " 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " (*Pennsylvania v. Mimms* (1977) 434 U.S. 106, 108-109 [98 S.Ct. 330, 332, 54 L.Ed.2d 331]; see also *United States v. Ramirez* (1998) 523 U.S. 65, 71 [118 S.Ct. 992, 996-997, 140 L.Ed.2d 191].) "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials . . . ' "to safeguard the privacy and security of individuals against arbitrary invasions." ' " (*Delaware v. Prouse* (1979) 440 U.S. 648, 653-654 [99 S.Ct. 1391, 1396, 59 L.Ed.2d 660] (*Prouse*), fn. omitted; *Camara v. Municipal Court* (1967) 387 U.S. 523, 528 [87 S.Ct. 1727, 1730, 18 L.Ed.2d 930].) "[T]he central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials." (*United States v. Ortiz* (1975) 422 U.S. 891, 895 [95 S.Ct. 2585, 2588, 45 L.Ed.2d 623].)

### A. *The Problem with General Warrants*

"It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that

motivated the framing and adoption of the Fourth Amendment [to the United States Constitution]." (*Payton v. New York* (1980) 445 U.S. 573, 583 [100 S.Ct. 1371, 1378, 63 L.Ed.2d 639], fn. omitted.) In 1761, James Otis denounced the general warrant as " 'the worst instrument of arbitrary power' . . . [because it] placed 'the liberty of every man in the hands of every petty officer.' " (*Boyd v. U.S.* (1886) 116 U.S. 616, 625 [6 S.Ct. 524, 529, 29 L.Ed. 746], fn. omitted.) John Adams, after witnessing Otis's famous oration, declared, " 'Then and there' the child Independence was born." (*Ibid.*) At the very least, then and there the Fourth Amendment was born.

General warrants were objectionable precisely because of their indiscriminate character, and the Fourth Amendment was designed to prevent indiscriminate searches and seizures conducted by petty officials with unfettered discretion. The framers sought to preclude "the petty tyranny of unregulated rummagers." (Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn. L.Rev. 349, 411.)

The first clause of the Fourth Amendment issues a global command: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." The second clause—specifically prohibiting the issuance of a warrant except "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"— addresses the narrower compass of traditional search warrants "for contraband, stolen goods, and the like." (Amar, *Fourth Amendment First Principles* (1994) 107 Harv. L.Rev. 757, 765, fn. omitted.) Its purpose was probably not to make warrants mandatory, but to limit the opportunity of the executive to obtain warrants in the first place. (See Taylor, Two Studies in Constitutional Interpretation (1969) pp. 38-50.)

Unfortunately, the Supreme Court's modern Fourth Amendment jurisprudence gives new vigor to petty rummagers. In analyzing searches incident to arrest, the court has tended to equate probable cause with reasonableness, but these terms "serve distinct functions, which are lost by homogenization of the legal vocabulary." (*Gramenos v. Jewel Companies, Inc.* (7th Cir. 1986) 797 F.2d 432, 442.) In *Whren, supra*, 517 U.S. 806, Justice Scalia authored a unanimous opinion in which the Supreme Court ruled that when a police officer observes a traffic violation, stopping the vehicle is reasonable and the officer's subjective motivation plays no part in the Fourth Amendment analysis. (*Id.* at pp. 810, 813 [116 S.Ct. at pp. 1772-1774].) *Whren* essentially legitimized pretextual stops—the sine qua non of unjustified and arbitrary law enforcement. A pretext stop occurs when "the justification proffered by the State for an arrest is legally sufficient, but where the

arresting officer was in fact making the arrest to search the arrestee incident to arrest for a reason which was legally insufficient to support the arrest." (Burkoff, *The Pretext Search Doctrine: Now You See It, Now You Don't* (1984) 17 U. Mich. J.L. Reform 523, 523.)

The court has clearly seen the need to curb police discretion only when law enforcement agents search and seize without probable cause (*Prouse, supra*, 440 U.S. at p. 663 [99 S.Ct. at p. 1401]), and when police operate under vague enforcement standards which confer a virtually unrestrained power to arrest. (*Kolender v. Lawson* (1983) 461 U.S. 352, 360 [103 S.Ct. 1855, 1859-1860, 75 L.Ed.2d 903] (*Kolender*).) In *Prouse*, an officer randomly stopped the defendant to check his driver's license and registration. The United States Supreme Court held that subjecting drivers to random checks, without reasonable suspicion, is unreasonable under the Fourth Amendment. (*Prouse*, at p. 663 [99 S.Ct. at p. 1401].) The *Prouse* court could not "conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. [Moreover,] [t]his kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." (*Id.* at p. 661 [99 S.Ct. at p. 1400].) *Whren* distinguished *Prouse* on the ground that the spot-checking officer did not have " 'probable cause to believe that a driver [was] violating any one of the multitude of applicable traffic and equipment regulations' " (*Whren, supra*, 517 U.S. at p. 817 [116 S.Ct. at p. 1776]), whereas in *Whren*, the arresting officer did have probable cause to believe that the defendant had violated a traffic law.

Probable cause to believe that a traffic violation has occurred does not adequately distinguish *Whren, Atwater* and the case at hand from *Prouse*, however. The United States Supreme Court purportedly believes that " 'observed [traffic] violations' . . . afford the ' "quantum of individualized suspicion" ' necessary to ensure that police discretion is sufficiently constrained." (*Whren, supra*, 517 U.S. at pp. 817-818 [116 S.Ct. at p. 1776].) In reality, an officer's discretion in deciding whom to stop is not constrained at all by a probable cause prerequisite because the officer need only point to a minor traffic violation to negate a claim of unfettered arbitrariness. (1 LaFave, Search and Seizure (3d ed. 1996) § 1.4(e), p. 123.) Due to the widespread violation of minor traffic laws, an officer's discretion is still as wide as the driving population is large.

In the pervasively regulatory state, police are authorized to arrest for thousands of petty malum prohibitum "crimes"—many too trivial even to be

honestly labeled infractions. They are nevertheless public offenses for which a violator may be arrested. Since this indiscriminate power to arrest brings with it a virtually limitless power to search, the result is the inevitable recrudescence of the general warrant. (Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses* (1997) 16 Pace L.Rev. 97, 146.)

An officer's observation of a very minor offense authorizes him to stop the car (*Whren, supra,* 517 U.S. at p. 817 [116 S.Ct. at p. 1776]) or bicycle (*U.S. v. McFadden* (2d Cir. 2001) 238 F.3d 198), arrest the driver or rider (*Atwater, supra,* 532 U.S. at p. 354 [121 S.Ct. at p. 1557]; *McFadden,* at p. 204), search the driver or rider (*Robinson, supra,* 414 U.S. at p. 235 [94 S.Ct. at pp. 476-477]), search the entire passenger compartment of the car including any package inside (*Belton, supra,* 453 U.S. at p. 460 [101 S.Ct. at p. 2864]), impound the car and inventory all of its contents (*Colorado v. Bertine* (1987) 479 U.S. 367, 374 [107 S.Ct. 738, 742, 93 L.Ed.2d 739]), and imprison the offender for up to 48 hours (*Atwater,* at p. 352 [121 S.Ct. at p. 1556]; *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56 [111 S.Ct. 1661, 1669-1670, 114 L.Ed.2d 49]).

Thus, after *Atwater,* the notion that "[a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation" (*Prouse, supra,* 440 U.S. at p. 662 [99 S.Ct. at p. 1400]) is simply no longer true. In fact, the same rules apparently apply to those who walk, bicycle, rollerblade, skateboard, or propel a scooter. Probable cause is ubiquitous.

Given the pervasiveness of such minor offenses and the ease with which law enforcement agents may uncover them in the conduct of virtually everyone,[4] the probable cause requirement is so diluted it ceases to matter, "for . . . there exists 'a power that places the liberty of every man in the hands of every petty officer,'" precisely the kind of arbitrary authority which gave rise to the Fourth Amendment. (1 LaFave, Search and Seizure, *supra,* § 1.4(e), p. 123, quoting 2 Wroth & Zobel, Legal Papers of John

---

[4]In a 1993 study conducted by the United States Department of Transportation, 50 percent of all vehicles monitored (71 percent on urban interstates and 80 percent on rural interstates) were violating the speed limit. (U.S. Dept. of Transportation, National Maximum Speed Limit—Fiscal Year 1993: Travel Speeds, Enforcement Efforts, and Speed-Related Highway Safety Statistics (Oct. 1995) tables 1, 3.) Add to this the traffic enforcement judgment calls—following too closely, touching lane divider lines, failing to signal, driving too slowly, and driving exactly the speed limit when an officer deems the speed unsafe for the conditions—and it becomes clear this is a game the police invariably win. In fact, driving in accordance with all traffic regulations can also be considered a suspicious circumstance. (See, e.g., *United States v. Smith* (11th Cir. 1986) 799 F.2d 704, 706-707 [criticizing use of drug courier profile that included driving "in accordance with all traffic regulations" as a factor].)

Adams (1965), pp. 141-142; see *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 205-206 [101 Cal.Rptr. 837, 496 P.2d 1205] *(Simon).*)

B. *The Problem with Vagueness*

The problem of arbitrariness is compounded in circumstances like these where the enforcement standard is impermissibly vague. A statute that either forbids or requires the doing of an act in "terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *(Connally v. General Const. Co.* (1926) 269 U.S. 385, 391 [46 S.Ct. 126, 127, 70 L.Ed. 322].) The basic premise of the void-for-vagueness doctrine is that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *(Lanzetta v. New Jersey* (1939) 306 U.S. 451, 453 [59 S.Ct. 618, 619, 83 L.Ed. 888].) In the Fourth Amendment context, constitutional reasonableness should "encompass procedural regularity as well as substantive fairness" and, as these facts illustrate, the two are often "tightly intertwined." (Amar, *Fourth Amendment First Principles, supra,* 107 Harv. L.Rev. at pp. 808-809.)

In California, a Vehicle Code offender is generally arrested pursuant to section 40300 et seq. For most violations, the Vehicle Code, recognizing the lesser degree of criminality associated with traffic violations, expresses a preference for citing and releasing the offender. (§§ 40303, 40304, 40500.) However, if the offender fails to present his "driver's license or other satisfactory evidence of his identity for examination," the officer *may* bring the offender before a magistrate, except in the case of a minor. (§§ 40302, 40302.5.) Here, defendant was arrested pursuant to section 40302 because he failed, in the majority's view, to present satisfactory evidence of his identity.

The majority correctly points out that "presenting a driver's license" or its functional equivalent avoids an intrusive custodial arrest under section 40302, "[s]o long as the [identification] is current, valid, and raises no suspicion that it has been altered or falsified." (Maj. opn., *ante,* at p. 620.) I disagree, however, with the majority's treatment of " 'other satisfactory evidence,' " namely, proffered oral identification. *(Id.* at pp. 620-622.) Effectively drafting a blueprint for arbitrary enforcement, the majority "reserves wide discretion to the officer to determine what [oral] evidence is satisfactory" and refuses to "review an officer's decision to reject oral evidence of identification, since that decision will be based entirely on the officer's assessment of the offender's credibility—an assessment involving intangible factors that may be difficult to reproduce in the courtroom." *(Id.* at p. 624.)

The principal vice is that the discretion granted to the arresting officer by the majority is impermissibly vague under *Kolender, supra,* 461 U.S. 352. The defendant in *Kolender* was convicted under Penal Code section 647, subdivision (e), which required that persons who loiter or wander on the streets provide "credible and reliable" identification when asked by an officer. (*Kolender,* at p. 353 [103 S.Ct. at p. 1856].) State decisional authority defined " 'credible and reliable' " identification as " 'carrying reasonable assurance that the identification is authentic and providing means for later getting in touch with the person who has identified himself.' " (*Id.* at p. 357 [103 S.Ct. at p. 1858].) The Ninth Circuit Court of Appeals determined that the statute violated the Fourth Amendment's proscription against unreasonable searches and seizures because it contained "a vague enforcement standard" susceptible to "arbitrary enforcement" and failed to give "fair and adequate notice of the type of conduct prohibited." (*Kolender,* at p. 355 [103 S.Ct. at p. 1857].) The United States Supreme Court agreed, noting the most important aspect of the vagueness doctrine is not actual notice but the " 'other principle element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' " (*Id.* at p. 358 [103 S.Ct. at p. 1858].) The Supreme Court held California's interpretation of the statute was unconstitutionally vague under the Fourteenth Amendment's due process clause, " 'confer[ring] on police a virtually unrestrained power to arrest and charge persons with a violation.' " (*Kolender,* at p. 360 [103 S.Ct. at p. 1860].)

The majority's grant of discretion to law enforcement under section 40302 and subsequent refusal to review that discretion fall squarely within the central concern in *Kolender*—"the full discretion accorded to the police to determine whether the suspect has provided a 'credible and reliable' identification necessarily 'entrust[s] lawmaking "to the moment-to-moment judgment of the policeman on his beat" ' . . . [and] 'furnishes a convenient tool for "harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." ' " (*Kolender, supra,* 461 U.S. at p. 360 [103 S.Ct. at pp. 1859-1860].)

The Court of Appeal in *People v. Monroe* (1993) 12 Cal.App.4th 1174, 1191 [16 Cal.Rptr.2d 267] (*Monroe*) rejected a similar vagueness attack on section 40302 by distinguishing the statute at issue in *Kolender* on the ground that section 40302 is procedural, not substantive. The validity of such a distinction is not self-evident. (*Monroe, supra,* 12 Cal.App.4th 1174, 1203-1204 (dis. opn. of Smith, J.).) Whether a statute is labeled procedural or substantive, it must provide "sufficiently definite guidelines for the police" to prevent "arbitrary and discriminatory enforcement." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1106-1107 [40 Cal.Rptr.2d 402, 892

P.2d 1145]; cf. *Hudson v. United States* (1997) 522 U.S. 93, 99 [118 S.Ct. 488, 493, 139 L.Ed.2d 450, 162 A.L.R. Fed. 737] [in assessing application of ex post facto prohibition against increased punishment, courts must consider not only legislative intent to label penalty criminal or civil, but also punitive purpose or effect].) Even assuming the procedural/substantive distinction could be determinative, it should not affect the analysis in this case. Although some cases have held that section 40302 is not a substantive criminal statute and cannot provide probable cause to arrest (*Simon, supra,* 7 Cal.3d at pp. 200-201), the facts of this case prove otherwise. Defendant was not legally required to have a driver's license in his possession, since only motor vehicle drivers, not bicyclists, are obligated to possess a driver's license while on the roadways. (§ 12951.) The majority asserts that *both* motor vehicle drivers and bicyclists "are required to produce satisfactory evidence of identity for examination when stopped for a violation of the law." (Maj. opn., *ante,* at p. 625.) The critical difference, however, is that the motor vehicle driver's obligation to possess a driver's license stems from substantive law; the bicyclist's or pedestrian's obligation derives solely from section 40302. In this way, as applied to defendant and any other bicyclist or pedestrian, section 40302 is *both* substantive and procedural in nature. (Cf. *Monroe, supra,* 12 Cal.App.4th 1174.) Therefore, *Kolender* is problematic to the majority's grant of "wide discretion to the officer to determine what evidence is satisfactory." (Maj. opn., *ante,* at p. 624.) "Although the initial detention is justified, the State fails to establish standards by which the officers may determine whether the suspect has complied with the subsequent identification requirement." (*Kolender, supra,* 461 U.S. at p. 361 [103 S.Ct. at p. 1860].)

With this in mind, I would adopt an "objective reasonableness" standard that requires the arresting officer to articulate specific " 'facts, which taken together with rational inferences from those facts, reasonably warrant [the additional] intrusion' of a full custodial arrest." (*Atwater, supra,* 532 U.S. 318, 366 [121 S.Ct. at p. 1564] (dis. opn. of O'Connor, J.); see also *State v. Walker* (Tenn. 2000) 12 S.W.3d 460, 466 & fn. 12 [holding officer lacked objectively reasonable basis for rejecting oral identification offered by defendant under a cite-and-release statute "similar in many respects to our own"].) This does not mean that an officer will be obligated to accept oral identification any time that it is given. The officer must still weigh the sufficiency of the identification with a corroborating source. If the proffered oral identification is not corroborated, the identification is unsatisfactory. "[T]his 'discretion,' if one may use that term, is not the complete unbounded discretion of which the majority speak. It is a discretion which can be abused if the officer acts unreasonably or arbitrarily." (*Monroe, supra,* 12 Cal.App.4th 1174, 1200 (dis. opn. of Smith, J.).)

## C. *The Virtue of Reasonableness*

In recent years, Fourth Amendment analysis has attained a kind of perverse, irrational fixity: probable cause equals reasonableness. Only by insisting probable cause and reasonableness are synonymous can courts avoid the socially costly consequences of the exclusionary rule. For this false peace, we pay too high a price. We are asked to surrender our right to be protected from unreasonable intrusions. Ironically, the severe sanction of the exclusionary rule has not discouraged unreasonable searches; it has, instead, shrunk the constitutional protection against them. (See, e.g., *U.S. v. Castro* (5th Cir. 1999) 166 F.3d 728, 735 (dis. opn. of Politz, J.) ["technical distortions and expansion of exclusionary rule exceptions threaten to make the fourth amendment a hollow shell of its former self"].) The police have a difficult, dangerous and often thankless job. Trying to combat crime and violence and protect the public without losing the public's trust is a formidable challenge. In the cause of public trust, the exclusionary rule has been at best counterproductive and at worst pernicious. Looking beyond probable cause and viewing reasonableness as a mandate of independent vitality restores some measure of constitutional balance. Probable cause and reasonable conduct are not the same thing. Requiring the police to behave reasonably—i.e., to assess their conduct in light of all the surrounding circumstances—is not asking too much. It is the same burden we impose on every adult. The Constitution demands no less of the government.

The high court has historically applied such a reasonableness test—balancing the individual's and the state's interests—notwithstanding the existence of probable cause. In a somewhat analogous case, the court held that a nighttime entry into a house to arrest a drunk driving suspect was unreasonable even though the officers had both probable cause and a legitimate claim of exigent circumstances. (*Welsh v. Wisconsin* (1984) 466 U.S. 740 [104 S.Ct. 2091, 80 L.Ed.2d 732].) The court found the intrusion unreasonable solely on the basis of the minor nature of the offense. "[T]he penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense." (*Welsh*, at p. 754, fn. 14 [104 S.Ct. at p. 2100].) Given this expression of the state's interest, the court ruled a warrantless home arrest could not be sustained simply because the offender's blood-alcohol level might have dissipated while police obtained a warrant. (*Ibid.*)

A similar traditional Fourth Amendment balancing of the legitimate governmental interests in arrest against the degree of intrusiveness upon an individual's privacy would reveal the unreasonableness of defendant's arrest

and search in this case. (See *Wyoming v. Houghton* (1999) 526 U.S. 295, 300 [119 S.Ct. 1297, 1300, 143 L.Ed.2d 408] [balancing "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests"].)[5]

Here, the state has classified the riding of a bicycle on the wrong side of the road, like most other Vehicle Code offenses, as an infraction. "An infraction is not punishable by imprisonment." (Pen. Code, § 19.6.) It is a fine-only offense subject to the Vehicle Code's cite-and-release "honor system, requiring the good faith and cooperation of the person cited." (*Simon, supra*, 7 Cal.3d at p. 201.) "If the State has decided that a fine, and not imprisonment, is the appropriate punishment for an offense, the State's interest in taking a person suspected of committing that offense into custody is surely limited, at best." (*Atwater, supra*, 532 U.S. 318, 365 [121 S.Ct. 1536, 1563] (dis. opn. of O'Connor, J.).)

Nor do I believe that the state's interest is significantly bolstered in this case because defendant failed to present documentary identification. The only logical reasons to confirm an offender's identity or guarantee a court appearance in the first place are to ensure that (1) the offender is held personally accountable for the traffic offense by paying the applicable fine and (2) the state actually receives the payment. What the majority fails to acknowledge is that "[i]n today's computer age the officer in the field has a host of readily available methods of verifying the identity of a person" in an objective manner. (*Monroe, supra*, 12 Cal.App.4th 1174, 1199 (dis. opn. of Smith, J.).) Attempting to verify oral identification would also be "[c]onsistent with California Highway Patrol policy" to avoid arresting a driver for merely failing to have a driver's license, so requiring officers to corroborate oral identification before arrest should not be problematic. (*People v. Grant* (1990) 217 Cal.App.3d 1451, 1455 [266 Cal.Rptr. 587].) For instance, patrol cars are now equipped with laptop computers, enabling an officer to quickly confirm proffered oral identification. (See, e.g., U.S. Dept. of Justice, Bureau of Justice Statistics, Law Enforcement Management and Administrative Statistics, 1999: Data for Individual State and Local Agencies of 100 or More Officers (Nov. 2000) pp. vi, xvi, 157-158, 193-194, 205-206, 242.)

---

[5]The *Atwater* majority suggests that state legislatures are in the best position to cure concerns about discriminatory enforcement. They can constrain officer discretion by statute. However, the fines and forfeitures collected for minor violations are a source of revenue for state and local governments. Whether their interest is in revenue or aggressive community policing, governments have no incentive to leave people alone. That is why we have a Constitution. "[The courts] are entrusted with [duties] as guardians of the Bill of Rights to apply limitations upon the legislature's power." (*U.S. v. Ferguson* (6th Cir. 1993) 8 F.3d 385, 398 (dis. opn. of Jones, J.).)

Alternatively, the officer could relay the information to the dispatcher, who, in turn, could verify the offender's identity. Or, the officer could "ask another person at the scene whose identity has been verified to vouch for the citee's identity." (*Monroe, supra,* 12 Cal.App.4th 1174, 1199 (dis. opn. of Smith, J.).) All of these techniques allow the arresting officer to corroborate the proffered oral identification or reject it on objective, rather than subjective, grounds.

Here, defendant furnished his name and date of birth to the officer. Only after arresting, handcuffing, searching and placing defendant in the back of the patrol car did the officer even attempt to corroborate defendant's oral identification on the laptop computer mounted in his patrol car. As it turned out, defendant's oral identification was quite accurate. When the means are readily available, an officer's failure to at least attempt to corroborate the proffered oral identification before placing the offender in custodial arrest is unreasonable per se. (See *State v. Satterwhite* (1997) 123 Ohio App.3d 322 [704 N.E.2d 259, 261] [holding that officer's failure to even attempt to verify the defendant's identity before making an arrest under a cite-and-release statute was objectively unreasonable].)

An objective reasonableness standard of review is also in accord with the Vehicle Code's cite-and-release "honor system." (*Simon, supra,* 7 Cal.3d at p. 201.) The entire legislative framework operates on the assumption that the offender will either honor his "promise to appear" in court or will mail the fine payment. (§ 40500 et seq.) Likewise, when an offender is stopped on a highway, he is trusted to furnish a valid driver's license or accurate oral identification. Oral identification may be false; documentary evidence may be fraudulent. In either case, the officer must, after corroboration, trust the citee's proffered identification or be able to articulate an objective reason for disbelieving it. The absence of a license—particularly in circumstances where no license is required—does not fatally undermine the violator's credibility. (See *Simon, supra,* 7 Cal.3d at p. 195.)

In the unlikely event that the officer has no readily available way to corroborate the offender's identity, I, like the majority, would hold that the officer's judgment in believing or disbelieving the offender is largely in the officer's discretion.

## II.

Every court that has approved sweeping search powers in conjunction with broad authority to arrest for minor offenses has acknowledged the *potential* for abuse. Of course, everyone who has not spent the last 20 years sealed in an ivory tower knows the problem is *real.* (But see *Atwater, supra,* 532 U.S. at pp. 351, 353 & fn. 12 [appen.] [121 S.Ct. at pp. 1556, 1557].) A

Gallup Poll released in December 1999 indicated more than half of the Americans polled believed police actively engage in racial profiling, and 81 percent of them said they disapprove of the practice. (U.S. Dept. of Justice, A Resource Guide on Racial Profiling Data Collection Systems: Promising Practices and Lessons Learned (Nov. 2000) p. 4 (DOJ).) Anecdotal evidence and empirical studies confirm that what most people suspect and what many people of color know from experience is a reality: there is an undeniable correlation between law enforcement stop-and-search practices and the racial characteristics of the driver. (See DOJ, *supra*, at p. 5; Brazil & Berry, *Color of Driver Is Key to Stops in I-95 Videos*, Orlando Sentinel Tribune (Aug. 23, 1992) p. A1; Harris, *The Stories, the Statistics and the Law: Why "Driving While Black" Matters* (1999) 84 Minn. L.Rev. 265, 279, 280-281, 295.)

Empirical data on stop-and-search practices in Maryland, New Jersey and New York also confirm statistically significant disparities between the rates at which people of color are stopped and searched and the rates for Whites in similar circumstances. (DOJ, *supra*, at pp. 7-9.) Nor has California been immune. Questions have been raised about the disparate impact of stop-and-search procedures of the California Highway Patrol. (McCormick et al., *Racial Bias in CHP Searches*, S.F. Chronicle (July 15, 2001) p. A-1.) The practice is so prevalent, it has a name: "Driving while Black."

Both the *Atwater* majority and the majority here suggest pretextual stops can be adequately remedied by challenging them as "being based on invalid criteria, such as race, religion, or other arbitrary classification."[6] (Maj. opn, *ante*, at p. 622.) Such a suggestion overlooks the fact that most victims of pretextual stops will barely have enough money to pay the traffic citation, much less be able to afford an attorney. Even if a pretextual stop victim is able to convince an attorney to handle the case pro bono, the defendant's chances of even obtaining discovery are slight, for he must first make "a credible showing of different treatment of similarly situated persons [of other races]" (*United States v. Armstrong* (1996) 517 U.S. 456, 470 [116 S.Ct. 1480, 1489, 134 L.Ed.2d 687])—a hurdle that has proved to be higher in the lower courts than one would initially suspect. (See, e.g., *U.S. v. Bell* (8th Cir. 1996) 86 F.3d 820, 823 [holding that the defendant did not meet the *Armstrong* standard because he did not present evidence about the number of

---

[6] I am of the opinion that the Fourth Amendment's reasonableness requirement, when read as broadly as it was written, includes within it a distaste for the discriminatory evils that the equal protection clause of the Fourteenth Amendment was designed to prevent. Moreover, one need not resort to the equal protection clause to challenge pretextual police conduct, when such inequitable behavior is inherently "unreasonable" under the Fourth Amendment. After all, "[t]he security of one's privacy against *arbitrary* intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society." (*Wolf v. Colorado* (1949) 338 U.S. 25, 27 [69 S.Ct. 1359, 1361, 93 L.Ed. 1782], italics added.)

White bicyclists who ride their bicycles between sunset and sunrise, although he did show that (1) all persons arrested for riding their bicycle without a headlamp that month were Black and that (2) 98 percent of all bicycles in the Des Moines, Iowa, area, populated predominantly by White people, did not have headlamps].) Such evidence will be hard to come by, *not* because there is "a dearth of horribles demanding redress," but because, logically, such incidents are rarely reported. (*Atwater, supra*, 532 U.S. at p. 353 [121 S.Ct. at p. 1557].) Most pretextual stops and searches will prove fruitless for the police; they will have no evidence to justify an arrest and will simply release the victim. Although a cognizable injury has occurred, the victim will have little incentive to spend the time, money, and energy required to pursue such a claim. Additionally, the victim of such an incident may not be entitled to relief "beyond barring prosecution of the *traffic* charge." (1 LaFave, Search and Seizure (2002 supp.) § 1.4, p. 25.) Quite simply, the equal protection clause is of little help to victims of pretextual stops and searches.

"The insult remains." (*State v. Overby* (1999) 1999 N.D. 47 [590 N.W.2d 703, 708] (conc. opn. of Vande Walle, C. J.).) To dismiss people who have suffered real constitutional harms with remedies that are illusory or nonexistent allows courts to be complacent about bigotry while claiming compassion for its victims. Judges go along with questionable police conduct, proclaiming that their hands are tied. (*U.S. v. Herring* (D.Or. 1999) 35 F.Supp.2d 1253, 1258.) If our hands really are tied, it behooves us to gnaw through the ropes.

## CONCLUSION

In the spring of 1963, civil rights protests in Birmingham united this country in a new way. Seeing peaceful protesters jabbed with cattle prods, held at bay by snarling police dogs, and flattened by powerful streams of water from fire hoses galvanized the nation. Without being constitutional scholars, we understood violence, coercion, and oppression. We understood what constitutional limits are designed to restrain. We reclaimed our constitutional aspirations. What is happening now is more subtle, more diffuse, and less visible, but it is only a difference in degree. If harm is still being done to people because they are black, or brown, or poor, the oppression is not lessened by the absence of television cameras.

I do not know Mr. McKay's ethnic background. One thing I would bet on: he was not riding his bike a few doors down from his home in Bel Air, or Brentwood, or Rancho Palos Verdes—places where no resident would be arrested for riding the "wrong way" on a bicycle whether he had his driver's

license or not. Well . . . it would not get anyone arrested unless he looked like he did not belong in the neighborhood. That is the problem. And it matters. "[T]he rule of law implies equality and justice in its application." (*Papachristou v. City of Jacksonville* (1972) 405 U.S. 156, 171 [92 S.Ct. 839, 848, 31 L.Ed.2d 110].) If we are committed to a rule of law that applies equally to "minorities as well as majorities, to the poor as well as the rich," we cannot countenance standards that permit and encourage discriminatory enforcement. (*Ibid.*)

According to *Atwater*, a full custodial arrest for a trivial infraction is constitutionally permissible. Broad powers to search incident to an arrest have a long common law and constitutional history. (Taylor, Two Studies in Constitutional Interpretation, *supra*, at pp. 28-29.) However, if full custodial arrest is authorized for trivial offenses, the power to search should be constrained. If broad searches incident to arrest are permitted, the power to effect a full custodial arrest should be limited. To permit both full custodial arrest for minor offenses and virtually unlimited authority to search incident to such an arrest allows officers to push past the boundaries of the Fourth Amendment. When officers may arrest for minor offenses, conduct virtually unlimited searches, *and* are granted unbounded and unreviewable discretion to select the target of such enforcement activity, the resulting search cannot be constitutionally permissible.

It is certainly possible to argue that the rationale of *Atwater* can be extended to encompass what happened here. The question is why we should do so. It is clear the Legislature could not authorize the kind of standardless discretion the court confers in this case. Why should the court permit officers to do indirectly what the Constitution directly prohibits? How can such an action be deemed constitutionally reasonable? And if we insist it is, can we make any credible claim to a commitment to equal justice and equal treatment under law?

Well . . . . No. Not exactly.